In the Matter of the Judicial Settlement of the Accounts of the FIRST TRUST AND DEPOSIT COMPANY (Formerly TRUST AND DEPOSIT COMPANY OF ONONDAGA) and Another, as Executors, etc., of HENRY L. ELSNER, Deceased.

THERESA R. KATZ, Appellant; FIRST TRUST AND DEPOSIT COMPANY, as Executor, etc., and Another, Respondents.

Fourth Department, November 12, 1924.

**Executors and administrators — principal and income — royalties received on book after testator's death should be apportioned between principal and income.**

Royalties received by an executor after the testator's death, on a book written by the testator and published under a contract providing for the payment of royalties, must be apportioned by the executor between principal and income.

TAYLOR, J., dissents.

APPEAL by Theresa R. Katz from a certain part of a decree of the Surrogate's Court of the county of Onondaga, entered in the office of said surrogate on the 12th day of July, 1921.

*McGowan & Stolz [Louis Marshall* and *James Marshall* of counsel], for the appellant.

*Hiscock, Doheny, Williams & Cowie [Daniel Scanlon* of counsel], for the respondent First Trust and Deposit Company, as executor.

*Howard D. Bailey,* for the respondent Henry L. Elsner, Jr.

DAVIS, J.:

Henry L. Elsner prior to his death was a physician of well-recognized learning and skill, residing and practicing in Syracuse.

On February 23, 1912, he entered into a contract with a publisher to write and prepare for the press a medical work entitled "Prognosis." In this contract he assigned the work and certain rights therein to the publisher, who was given the exclusive right to take out and hold copyrights and their renewals, and to publish the work. The author agreed to supply complete copy for the book on or before January 1, 1916. On his part he was to receive from the amounts obtained on sales, after payment of the cost of manufacture, a certain percentage on the retail price of books sold at a profit, called a "royalty." After the expiration of five years the publisher could cancel the contract and the author had the option under certain conditions of taking the plates and the unsold copies of the work. It was provided further that the contract as a whole might be assigned by either party.

Dr. Elsner died February 17, 1916, leaving a last will and testament and a codicil thereto executed respectively May 31, 1913, and October 28, 1915. Without going into detail certain provisions of the will created trust estates and provided for payment of the income by the executors and trustees to certain beneficiaries, with the remainder disposed of otherwise.

A controversy has arisen amongst those interested in the estate as to whether royalties heretofore paid constitute principal or income. The distribution thereof between certain claimants depends upon how this vital question is determined. The executors petitioning the Surrogate's Court for an intermediate accounting and judicial settlement, asked the court to decide the question for their present and future guidance.

There is no proof as to just when the publication of the book began. It does appear that a substantial sum was paid to the executors "from publication to December 31, 1916." As the contract required Dr. Elsner to have his copy complete on or before January 1, 1916, presumptively the publication had begun and the contract was in effect before testator's death.

The will and codicil make no mention of the book or of anticipated royalties, so that we have no definite information as to the testator's intent concerning them. We must, therefore, conclude that in his mind the status of this property was the same as that of his other assets.

It is claimed by appellant that the sums paid under the contract are entirely income. The remaindermen assert that such sums constitute exclusively principal or capital.

The question presents many difficulties. Such funds partake of the nature both of principal and income. The original principal or capital was the book itself, a creation of the skill, experience and

learning of the author. The book might have been sold directly to the publisher either for a definite sum payable immediately, or by installments for a term of years. In either case, the principal would then be the sum of money thus received, substituted in place of the original capital, the book. This sum if invested would produce income. But the author preferred to take a speculative contract, in effect a sale (*Matter of Richards*, L. R. [1907] 2 K. B. 33), whereby he received a percentage of profits to continue as long as the book met with profitable sale. The principal is, under these circumstances, the beneficial interest the author had in this contract, its present value as a producer of income. It would be a simple question if the principal remained unimpaired in value. Its earnings would be income. But it is common knowledge that professional works are books of a period and their profitable life limited in time. Progress in the particular science concerning which they treat opens new and interesting fields of research and discovery. Almost invariably later books by other authors containing the new learning thus acquired supersede the older books. Their sale declines and vanishes. This is obviously the experience of this book which produced royalties of nearly $4,000 in 1916, and but $13.50 from July 1, 1922, to December 31, 1923.

Where, then, is the principal now? Does it still nominally exist in the contract which has become unproductive, or has it entered into the royalty payments in part, as though sold with payments to be made by installments over an indefinite number of years.?

On the other hand, if all the royalties were installments of principal, where was the income during the life of the contract? It is no sufficient answer to say that the royalties when invested will produce income; any income reinvested will do that. Such a book published under a beneficial contract of this kind produces an income both for the purpose of taxation and as the term is commonly understood; and income is not derived alone from profitable investment of capital, but may arise also in earnings from labor, skill or a calling or profession, or a combination of any of these factors. (*Stratton's Independence* v. *Howbert*, 231 U. S. 399; *United States* v. *Oregon-Washington R. & N. Co.*, 251 Fed. Rep. 211.)

Dr. Elsner in his lifetime had a capital of learning and skill in his profession. He maintained an office, no doubt containing medical works, instruments and ordinary equipment. He had doubtless a large clientele. From this principal in his practice he earned an income. He might have sold his practice and office

37

equipment to another and retired. The sum realized would have been his substituted principal; the earnings thereon, if invested, would have been his income. If he remained in practice this original capital must with advancing years have diminished and become less productive of income, and at last valueless. Thus, also, with the book, the product of his skill; capital and income must eventually disappear; it cannot endure like more tangible property. In a case like this the principal and income blend and merge in the payments. It is like selling real estate, having a rental value, for a fixed sum payable annually for a definite term of years with possession to the purchaser during the period, and with his title becoming absolute upon making payment in full. Here the rent or income is merged with a payment on principal. Yet the present value of the property can be fixed and the fair income therefrom for the term be determined. In like manner, a purchased annuity represents payment during life or a term of years of both the principal and income of the original investment.

Neither " royalty " nor " income " admit of precise legal definition. In certain cases dealing with mineral products, the term " royalty " is deemed an appropriate word to apply to rental based upon the quantity taken from the mine (*Raynolds* v. *Hanna*, 55 Fed. Rep. 783) or to the share of the product or profit reserved to the owner for permitting another to use the property or remove the mineral (*Indiana Natural Gas & Oil Co.* v. *Stewart*, 45 Ind. App. 554; *Kissick* v. *Bolton*, 134 Iowa, 650; *Higgins Oil & Fuel Co.* v. *Snow*, 113 Fed. Rep. 433) and, therefore, royalties are often treated as income. (*Matter of Woodburn*, 138 Penn. St. 606.) The same rule is adopted with limitations in treating such royalties as income for purposes of taxation. (*New Creek Co.* v. *Lederer*, 295 Fed. Rep. 433, 435; *Von Baumbach* v. *Sargent Land Co.*, 242 U. S. 503.) These definitions, however, are scarcely appropriate to the royalty or percentage paid to the author by the publisher of a book.

Here the property, intangible in character, is the creation of the mind and skill. With the protection given by the law, publication has been united with profit. (*Silverman* v. *Sunrise Pictures Corp.*, 273 Fed. Rep. 909.) In the case of copyrights and patents, the term " royalty " is commonly used to designate the share of the proceeds of property, paid to a person having some proprietary or creative interest therein, by another who has obtained from the payee an absolute or qualified ownership of such property.

Income also is an elastic term, variously defined, depending in part upon the particular legal sense in which the term is used. But, as already stated, it is generally regarded as gain produced by investment of capital, or from labor, skill and enterprise or from a

combination of any or all of these elements.   The amount received thereby is distinctly separate from the principal, and though it may be affected in its amount by a decline in the value of the principal, it is not required to contribute to the capital loss, but retains at all times its distinctive character.

Where a decedent's estate consists of income-producing capital, it may be of a kind that retains a permanent value; or it may be of a kind that depreciates in value when held by the executors in trust or by life tenants.   This depreciation may occur through necessity for repairs, and in that case the trust estate or life tenant must assume the obligation of preventing waste.   Or it may consist of property known as " wasting " securities (*Frankel* v. *Farmers Loan & Trust Co.*, 152 App. Div. 58) or " property which may be consumed in the using."   (*Cairns* v. *Chaubert*, 9 Paige, 160, 163; *Spear* v. *Tinkham*, 2 Barb. Ch. 211, 214.)

Where such property not specifically bequeathed comes into the hands of the executors, trustees or life tenant of an estate, if it is retained the rule has long been established that the person given the use or income is entitled to receive only the income on the value of the property at the death of the testator (*Cairns* v. *Chaubert*, *supra*), with a duty to account for the principal to the remainder-men.   (*Covenhoven* v. *Shuler*, 2 Paige, 122.)   Ordinarily it is regarded the duty of the executors or trustees to convert such property into money and invest it in permanent securities, paying the income over to the person entitled thereto for life, or a term of years, retaining in their hands the principal sum for the benefit of the remaindermen.   (*Spear* v. *Tinkham*, *supra; Howe* v. *Earl of Dartmouth*, 7 Ves. Jr. 137.)   If such property is retained by the executors, then there should be an apportionment of value between the principal and the income.   For a long period this rule has been applied in this State.   A statutory rule long existing and generally applicable is now found in section 204 of the Surrogate's Court Act.   It provides that not only rents, annuities and dividends but " other payments of every description made payable or becoming due at fixed periods under any instrument   *   *   * or being a last will and testament   *   *   *   shall be apportioned so that on the death of any person interested in   *   *   * such payments   *   *   * or *on the determination by any other means of the interest of any such person,* he   *   *   * shall be entitled to a proportion of such   *   *   * dividends and other payments   *   *   *."

We think the property represented by the contract and the royalties can and should be apportioned between capital and income. Not only does the statute justify such a solution, but the practice

has long been recognized and adopted in analogous cases, both in this and other jurisdictions. (*Matter of Kendall,* 4 Dem. 133; *Matter of Housman,* Id. 404; *Sacandaga Realty Corp.* v. *Henes,* 173 App. Div. 785; *Cairns* v. *Chaubert, supra; Deffenbaugh* v. *Hess,* 225 Penn. St. 638; 36 L. R. A. [N. S.] 1099; *Matter of Earl of Chesterfield's Trusts,* L. R. 24 Ch. Div. 643; 28 Halsbury's Laws of England 32 *et seq.; Matter of Hobson,* 55 L. J. Ch. 422. See, also, *Frankel* v. *Farmers Loan & Trust Co., supra,* 61; *Matter of Martens,* 16 Misc. Rep. 245.)

Very likely it would have been better had the executors sold and assigned their interest in the contract, as they had a right to do, shortly following the testator's death, and thus obtained a definite sum which they could have invested, paying the income to the beneficiaries and retaining the principal sum for the remaindermen. This controversy would then have been avoided. A contract of this nature is capable of having its present value as principal assessed as of the date of testator's death. Experienced publishers could make as fair an estimate of that value as could expert appraisers of real estate and personal property. But with the history of publication and sale we now have, it amounts to little more than a mathematical calculation. (See *People ex rel. Cornell* v. *Davenport,* 30 Hun, 177.)

To hold that the entire proceeds are principal would be to deny that the capital earns any income; to hold that the royalties are entirely income, leads to the result that a capital sum must become eventually unproductive and valueless. Either theory results in injustice, and we are not inclined to adopt either the one or the other.

For the reasons stated, we take the view that there must be an apportionment of the royalties between principal and income; and that the decree should, therefore, be reversed on the law and the matter remitted to the Surrogate's Court for the parties to take such further action therein as they may be advised, without costs.

HUBBS, P. J., CLARK and CROUCH, JJ., concur; TAYLOR, J., dissents and votes for affirmance.

Decree reversed on the law, without costs, and matter remitted to the Surrogate's Court where the parties may take such further action therein as they may be advised, in accordance with the **opinion.**