In the Matter of the Estate of H. Hardcastle Pennock, Deceased.

Surrogate's Court, New York County, July 15, 1939.

*Davis, Polk, Wardwell, Gardiner & Reed,* for The National City Bank of New York, as executor.

*Richard Steel,* for Carol H. Pennock, individually and as executrix.

*Mitchell, Taylor, Capron & Marsh*, for City Bank Farmers Trust Company, trustee under agreement with deceased.

*Alexander S. Andrews*, special guardian for infants.

*DeWitt, Van Aken & Nast*, for respondent Hilda Jensen.

*Arthur L. Burchell*, for claimant Alice Hendrickson.

*Larkin, Rathbone & Perry*, for Gerald Eubank, Inc., objectant.

DELEHANTY, S. Deceased gave his residuary estate in trust. The net income therefrom is given to his widow for life. Secondary life interests in equal shares are given to his children. By the fifth paragraph of his will deceased authorized his executors and trustee " to retain as investments for the trusts hereby created any of the securities or property in which my estate may be invested at the time of my death, until in their discretion they shall deem it advisable to dispose of them * * *. Upon any sale of such securities, I direct my executors or trustee to invest the proceeds in such securities as are legal for trust funds. I direct that all stock dividends received by my trustee be held as part of the corpus of the trust estate."

The principal asset of the residuary estate consists of ten contracts which deceased had with as many insurance companies. Under these contracts (unless sold) the estate over a period of years will receive commissions on premiums paid the companies on policies of insurance which deceased had negotiated as the companies' agent. If the maximum commissions which under the most favorable conditions will become due on renewal premiums are collected by the estate it will obtain over $160,000. This maximum is based on two assumptions: (1) That none of the policies will be permitted by the insured person to lapse, and (2) that none of the insured will die during the operative contract period. For estate tax purposes the contracts were valued at $87,135.32. From the date of death to the closing date of this account the executors made actual collections of $53,457.85. It appears likely that when all collections have been made the aggregate amount realized will far exceed the figure fixed for tax computation. The legal question is whether the excess over the tax valuation of commissions actually collected constitutes principal or income or both in the residuary trust.

The court had this exact question before it in *Matter of Straus* (N. Y. L. J. July 8, 1938, p. 67). There it was held that " the contract rights of the deceased in connection with so-called renewal accounts constitute capital of his estate and * * * all the proceeds therefrom must be treated as capital. The valuation

made as to date of death is important for tax purposes but the realization under the contract (whatever its amount) must be treated as capital. So far as realized on at the time the trust is set up the proceeds are to be used in computing the net estate and thus will enter in the computation of the trust capital * * *. For the purpose of the computation of commissions the court will require that the actual collection under the contract be used as the basis for receiving and paying out commissions, reserving to the executors the right in a future accounting to claim further commissions on further collections."

A different ruling on substantially the same question was made by the highest court of Rhode Island in *Industrial Trust Co.* v. *Parks* (57 R. I. 363; 190 A. 32). There as in the present case the residuary estate was put in trust. The trustees were given power to retain deceased's investments. Included therein were valuable contracts similar to those now under consideration. The court held that the case came within the rule of *Howe* v. *Earl of Dartmouth* (7 Ves. Jr. 137), discussed hereinafter, and, after examining many additional authorities (including some New York cases), concluded that the will before it showed no intention of deceased that the contracts should not be sold nor did any intention appear that the proceeds as collected should be deemed wholly principal or wholly income. Accordingly it was held appropriate to apply the " doctrine of conversion of wasting or non-productive assets " as that doctrine had been formulated by *Howe* v. *Earl of Dartmouth* (*supra*). The result was that the trustees were directed to sell the contract rights to renewal commissions when a proper price was forthcoming. Pending such an outcome they were ordered to apportion the commissions collected in the same way " as they would have been apportioned if such rights had been sold by the trustees immediately after the death of the testator for the sum of $129,074 (apparently the estimated value as of the date of death) and that sum had been loaned by the trustees at interest at the same rate as the rate of income that could reasonably have been expected from a proper investment of that sum in income producing securities, and such payments had been received by the trustees as payments of the accrued interest and on account of the principal of the loan so made." There was a further direction to readjust the apportionment when the rights were finally sold or the last payments of the commissions were received.

*Howe* v. *Earl of Dartmouth* (7 Ves. Jr. 137) was a case where deceased bequeathed his personalty to successive life tenants with remainder over. The estate consisted in part of long annuities **and short** annuities. It was argued to the court that since the

gifts were not specific and since this personalty was of a kind that would " wear out " the fiduciary was under a duty to sell it and to invest the proceeds in three per cent consols. By this means it was said the life tenant would have no advantage over the remainderman. The chancellor (Lord ELDON) held this argument to be sound. He went somewhat beyond the precise terms of the controversy before him to say: " If in this case it is equitable that Long or Short Annuities should be sold, to give everyone an equal chance, the Court acts equally in the other case; for those future interests are for the sake of the tenant for life to be converted into a present interest; being sold immediately, in order to yield an immediate interest to the tenant for life. As in the one case that, in which the tenant for life has too great an interest, is melted for the benefit of the rest, in the other that, of which, if it remained in specie, he might never receive anything, is brought in; and he has immediately the interest of its present worth." The chancellor also indicated that the rule thus formulated presupposed that the will of deceased did not afford evidences of · a testamentary intention that wasting or unproductive assets should be treated differently. The rule, therefore, as formulated was one of interpretation and could not properly be applied if a contrary intention should be found in the will. (77 A. L. R. 754, 761.).

In New York the first applications of the *Howe* v. *Earl of Dartmouth (supra)* rule seem to have occurred in *Covenhoven* v. *Shuler* (2 Paige, 122 [1830]) and *Cairns* v. *Chaubert* (9 id. 159 [1841]). In the latter case life interests were given in an estate, the assets of which included a twenty-nine-year interest in a bridge together with leasehold property on which a toll house had been constructed. The court cited and applied the *Howe* v. *Earl of Dartmouth (supra)* principle. It said (p. 163): " The bridge and franchise, including the improvements upon the toll house and barn and the leasehold property, should be valued together at what they were worth in cash immediately after the testator's death; and the executrix should be allowed the interest on that amount, out of the tolls or income exclusive of taxes, for life, or until the property is actually sold. And the residue of the income must be accounted for by her, and added to the capital of the fund and accumulated; so as to place those who are interested in the remainder in the same situation as if the bridge property and the expenditures thereon had been sold and converted into a permanent capital within the year after the death of the testator."

In these ancient cases the problem was treated as one requiring protection of remaindermen. The courts were urged to hold that in respect of assets of a consumable, wasting or deteriorating char-

acter failure to apply the *Howe* v. *Earl of Dartmouth* (*supra*) rule requiring conversion would result in the remainderman getting nothing. (*Spear* v. *Tinkham*, 2 Barb. Ch. 211, 214, 215 [1847].) The *Howe* v. *Earl of Dartmouth* (*supra*) rule has been frequently cited and applied. (*Matter of Housman*, 4 Dem. 404, 413; *Matter of Golding*, 127 Misc. 821, 824, 825; *Matter of Hall*, 130 id. 313; *Livingston* v. *Murray*, 68 N. Y. 485, 492, 493.)

Nevertheless, since the rule is one of interpretation it fails to come into operation if the deceased indicates a different intention. In *Matter of Chapman* (32 Misc. 187; affd., 59 App. Div. 624; affd., 167 N. Y. 619) deceased authorized the continuation of his investment in a ship. The court there held that deceased intended the whole earnings of the ship to be paid the life tenant since the will of deceased showed that he had not intended that any of these earnings should be applied to a sinking fund designed to offset the ship's depreciation. Again, where the deceased gave his widow one-half of the income of all his property, which included stocks of railroad construction companies, the "dividends" of which were in fact capital distributions, the court, on the basis of the language in the will, held that no apportionment was proper. (*Matter of James*, 146 N. Y. 78, 97.) The court said: "It seems to me that in this case the intention of the testator, that his personal estate shall remain in specie, the income of which should be received and enjoyed by his wife as it had been by himself, is manifest." And at page 103 the court added that "In this State the rule laid down in the *Earl of Dartmouth's* case was early adopted, as applicable in the absence of any indication of an intention on the part of the testator that the legatee for life should enjoy the property in its then state." To the same effect see *Matter of Fanoni* (88 Misc. 442, 450; affd., 169 App. Div. 958; affd., 216 N. Y. 640) and *Matter of Hilliard* (164 Misc. 677; affd., 254 App. Div. 879). (See, also, Restatement of the Law of Trusts, § 239; 4 Bogert on Trusts and Trustees, 2412, § 828-b.) The English cases make the same distinction. (*Alcock* v. *Sloper*, 39 Eng. Rep. 1111, 1113; *Collins* v. *Collins*, Id. 1113; *Prendergast* v. *Prendergast*, 10 id. 75, 86; *Morgan* v. *Morgan*, 51 id. 214, 219; *Chambers* v. *Chambers*, 60 id. 587.)

It is notable that the courts have often formulated the general problem as involving only two of the three conceivable alternatives. The problem has been stated to be whether the life tenant should enjoy the property in specie or should have only the earnings predicated on a death date valuation. Lord BROUGHAM's language in the House of Lords case of *Prendergast* v. *Prendergast* (*supra*) is typical. He said: "if a gift be to one for life, with remainder to another; the Court, considering that there is a clear intention

of giving to the remaindermen that which the first taker was to have for his life will prevent perishable and temporary interests from being wholly enjoyed by the tenant for life, and the remainderman disappointed * * *. This just purpose can only be effected by a conversion in some cases of the perishable property, and giving the party entitled for life only the enjoyment of the fruits of that into which the corpus has been converted. Thus, terminable annuities and leaseholds will be sold and the price invested for the benefit, first, of the taker for life; next for that of the party or parties in remainder. But as this proceeds wholly upon a regard for the testator's manifest intention, a like regard must be paid to whatever indicates a design on his part that, notwithstanding the form of the gift, the first taker should enjoy the subject-matter in specie, and thus possibly defeat the subsequent gift in part or even in whole, for *cujus est dare ejus disponere*. The court therefore attentively and anxiously looks to all indications of such an intention, and before it orders a conversion, must be satisfied that such a course is not excluded by the whole instrument taken together."

What is disregarded in that statement is the possibility that an asset the nature of which is in doubt might be claimed wholly as principal either by virtue of the language of a will or because of the nature of the asset itself. Such an asset would neither be enjoyable in specie by the life tenant nor subject to apportionment between life and remainder interests. This third possibility actually appeared (for the first time it would seem) in *Meyer* v. *Simonsen* (64 Eng. Rep. 1316 [1852]). There deceased gave his widow a life interest in his estate. During his life he had invested a large sum of money in a partnership. The articles of partnership provided that upon deceased's death his partnership interest should be retired by way of annual installments. Balances unrefunded were to return an annual interest of five per cent. The question developed before the court was whether the life tenant should get the entire five per cent or four per cent only, which apparently was the return on consols at that time. Throughout the discussion it was always assumed that the deceased's *capital* interest in the partnership, although payable into the estate over a period of years by way of installments, was principal only. The same ruling was made in *Matter of Llewellyn's Trust* (54 Eng. Rep. 542). And in *Wentworth* v. *Wentworth* (L. R. [1900] A. C. 163) the principle of the *Meyer* v. *Simonsen* case (*supra*) was further developed by a holding that where *a capital asset was directed not to be converted* it could be neither enjoyed in specie nor subjected to apportionment.

It would be a mistake to suppose that all English cases fall

neatly into classes comprised respectively of instances where the property was to be enjoyed in specie, instances where it was not to be enjoyed at all save to the degree measured by the legal rate of return on an asset not fully collectible in specie until a certain time had elapsed and instances in which the asset was wholly removed from enjoyment by the life tenant. Most cases would seem to fall into one or other of these three classes. Yet in *Crawley* v. *Crawley* (58 Eng. Rep. 901) it developed that part of a trust consisted of a redeemable annuity of £400 granted to the testatrix for sixty years. The executors were unable to sell it. The question was: how did the life tenant stand with regard to this money? The court said: " the executors, until they could sell the annuity, *must invest the payments of it,* and that the interest of the investments would be payable to the tenants for life of the residue, and the capital would form part of the capital of it." This case was followed as late as 1894 in *Matter of Whitehead* (L. R. [1894] 1 Ch. 678). There deceased had created a residuary trust. One of deceased's assets consisted of income on deferred legacies payable to others under a third party's will. This income was to the deceased payments in the nature of " terminable annuities." There was mention by the court of *Howe* v. *Earl of Dartmouth (supra),* yet the case was apparently not regarded as controlling. On the authority of the *Crawley* case *(supra)* these " terminable annuities " (which would terminate when the legatees under the third party's will would attain certain ages and thus qualify to take their respective gifts) were held to be in the nature of capital for the deceased's residuary trusts.

The most recent New York cases which come closest to the present controversy are *Matter of Elsner* (210 App. Div. 575 [4th Dept. 1924], TAYLOR, J., dissenting) and *Rubenstein* v. *Rubenstein* (221 id. 612 [3d Dept. 1927]). In the *Elsner* case deceased wrote a book which he assigned to a publisher under a contract providing that the author should receive a percentage on the retail price of books sold at a profit after the publisher in the first instance had fully recovered his manufacturing costs. The question was whether deceased's " royalties " (chiefly payable after his death as the event happened) constituted principal or income to his trust estate. His will was silent on the subject. The court held that the royalties partook of the character of both principal and income and should, therefore, be apportioned. It said (p. 577): " The book might have been sold directly to the publisher either for a definite sum payable immediately, *or by installments for a term of years. In either case, the principal would then be the sum of money thus received,* substituted in place of the original capital, the book

* * *. But the author preferred to take a speculative contract, in effect a sale (*Matter of Richards*, L. R. [1907] 2 K. B. 33), whereby he received a percentage of profits to continue as long as the book met with profitable sale. The principal is, under these circumstances, the beneficial interest the author had in this contract, *its present value as a producer of income.*" (Italics supplied.)

The court held that the royalties should be apportioned between capital and income. The intimation it gave that the result would have been different had the deceased sold his book for a fixed amount even though the amount was payable in installments was more fully developed in *Rubenstein* v. *Rubenstein* (*supra*). There deceased in his lifetime owned a lease for twenty-one years. This he assigned " at an increased rental of $1,200 per annum." The briefs on appeal show that *Matter of Elsner* (*supra*) was cited to the court. It was held that the annual payments to the estate constituted principal only. The court said (p. 615): " The plaintiff claims that this $1,200 per year is income to which she is entitled, while the defendant claims that it constitutes a part of the corpus of the estate. The lease was an estate for years and like an estate in fee or an estate for life was alienable. The testator sold it. His interest therein ceased * * *. Had the purchase price of the lease been paid in a lump sum obviously it would constitute part of the corpus of the estate. It makes no difference that the purchase price instead of being paid at one time is paid in annual installments."

Though the problem now before the court " presents many difficulties," as was said in the *Elsner* case (*supra*), certain principles do seem to be established by the authorities. The first and basic principle is that the manifest intention of the deceased if stated in his will determines the character of an asset otherwise of an uncertain nature from the principal-versus-income standpoint. The next principle is that where deceased has given no directions on the subject but has committed his estate to successive interests, as by the creation of a trust, his intention must be interpreted to be that all interests shall enjoy *the same thing*. It is to effectuate this presumed intention that apportionment is ordered. The third principle is that apportionment is ordered only where it appears that otherwise the successive interests will not enjoy *the same thing*. It is in connection with this last principle that it becomes of importance to examine the inherent nature of the asset itself or, in other words, to identify' the asset and then to determine whether in course of time it undergoes deterioration, suffers exhaustion or is otherwise so affected as to give one party an unfair advantage over the other.

Applying these principles to the present case the court holds that the renewal commissions are wholly capital. This result is not placed on the ground that the deceased's will gives express directions to treat the commissions as capital although the circumstance that he ordered stock dividends to be dealt with as capital indicates that future receipts under the commissions contracts should receive like treatment. The decision is grounded on the second and third principles stated above.

Oil wells, timber, mines, vessels, corn, wine, etc., are assets which by their nature suffer diminution and eventual exhaustion in the course of time. They are consumable or deteriorating goods. About them there can be no doubt that apportionment must be made (in the absence of contrary testamentary instructions) if successive interests are to enjoy the same thing.

Leaseholds, annuities and interests *pour autre vie* are essentially *temporary* as differentiated from *permanent* interests. For successive estates in such cases to enjoy the same thing the permanent must be substituted for the temporary. This can be done in either of two ways: (1) By actual conversion of the " wasting " asset, or (2) by theoretical conversion accomplished through a sinking fund or by a similar mathematical device.

Royalties on books or patents are assets which by their nature are neither consumable goods nor temporary estates. Fundamentally they are the uncertain speculative rewards of ideas embodied in books and patented schemes which constitute the original capital. In default of outright sale the author or patentee agrees to accept royalties to compensate him for his labors and as a practical matter he thereby allows his capital to be drained into and merged with his income account. To separate the two accounts apportionment is directed.

Where the author or patentee sells outright no such merger of principal and income occurs. As the *Elsner* case (*supra*) shows, apportionment in such circumstances would not be directed. Renewal commissions do not partake of the nature of consumable or deteriorating goods. They are not fundamentally interests definable in terms of time. They do not consist of a merger of capital and income accounts because of the presence of a speculative and uncertain factor. They are simply installment payments for work completely performed. They are like the partnership capital in *Meyer* v. *Simonsen* (*supra*), like the $1,200 per annum excess on the leasehold in *Rubenstein* v. *Rubenstein* (*supra*) and like the outright sum for which a book or patent might be sold. They are, therefore, capital and capital alone. They are comparable to the installments due on a debt of deceased payable in install-

ments. It can readily be supposed that deceased might have obligated himself on a series of notes, without interest, falling due at various dates after his death. As of date of death the capital value of those notes would obviously be less than the amount eventually payable on them. No argument can be made from that fact that income account should bear the difference.

The contracts which give rise to the right to payments of renewal commissions do not constitute a wasting asset. The rights established by those contracts are all in existence at the date of death. The payments made under the contracts are payments for services actually completed at the date of death. They differ in no respect from payments of fees made for work and services fully performed.

The petition requests construction of the ninth paragraph of deceased's will, which says: " I direct that all administration expenses and taxes against my estate or the legacies and bequests herein contained, shall be paid out of my residuary estate, and shall not be a charge against any legatee herein." The petition says that there have been or will be included in the gross tax estate of deceased some real estate located in Florida, the capital of an inter vivos trust and certain insurance moneys payable to others than the estate. The question is whether the quoted text of the will imposes upon the residuary estate the burden of the taxes payable because of the inclusion in the gross tax estate of property other than the true estate of deceased. The court holds that the direction in the will relates only to the true estate. The property entering into the gross tax estate from outside sources must pay its own share of the respective estate taxes. Only the non-residuary gifts passing under the will are exonerated from the tax burden. (Matter of Kaufman, 170 Misc. 436, 440.)

The remaining issues formulated in the petition, answers, objections and report of the special guardian are disposed of as follows: The widow's claim to jewelry valued at $317 is allowed. Her claim to a small sum in coins is also allowed. (Surr. Ct. Act, § 200.) The claim of Christine H. Pennock to a fourteen-karat gold watch is dismissed. The claims made by the doctors who performed an autopsy on the body of deceased are allowed. The autopsy had been requested by deceased. By directing the autopsy to be performed deceased impliedly directed that payment therefor should come from his estate. There can be no doubt that deceased had the right to give such a direction. (Cf. Matter of Johnson, 169 Misc. 215.) The Hayward claim for thirty-five dollars and sixteen cents is dismissed on default. No ruling is required on the Morgan claim since it has been allowed and paid by the executors. The Hart claim is dismissed on the default of claimant. The

excess payments made on the Larisch insurance policy are held to be principal. The cumulative preferred dividends on the Alfar stock which were both declared and paid subsequent to the date of deceased's death are held to be income. With reference to the Eubank contingent claim for $206.10 the executors are directed to set up a reserve to assure its payment when and if it becomes due.

Submit, on notice, decree construing the will and settling the account in conformity with this decision.