In the Matter of the Judicial Settlement of the Intermediate Account of Proceedings of THE NATIONAL CITY BANK OF NEW YORK and CAROL HENDRICKSON PENNOCK, as Executors under the Last Will and Testament of H. HARDCASTLE PENNOCK, Deceased.*

CAROL HENDRICKSON PENNOCK, Individually and as One of the Executors, etc., of H. HARDCASTLE PENNOCK, Deceased, Appellant; THE NATIONAL CITY BANK OF NEW YORK, as One of the Executors, etc., of Said Deceased, and CONSTANCE LOIS PENNOCK and Others, Infants, Respondents.

First Department, June 19, 1940.

* Revg. 172 Misc. 10.

*Richard Steel,* for the appellant.

*David M. Potts* of counsel [*Davis, Polk, Wardwell, Gardiner & Reed,* attorneys], for the respondent The National City Bank of New York, as executor.

*Alexander S. Andrews,* special guardian, for the infant respondents.

DORE, J.  On this appeal from a decree of the Surrogate's Court the sole issue presented is whether renewal commissions from premiums paid after a testator's death on insurance policies written by him during his life are entirely principal or partly principal and partly income of a residuary testamentary trust.  The learned surrogate in an opinion (*Matter of Pennock,* 172 Misc. 10) held that all such commissions were wholly capital.  The testator's widow, life beneficiary of the residuary trust, appeals claiming there should be an apportionment of such commissions.  The trustee takes no position.

For many years prior to his death on October 10, 1935, the testator, H. Hardcastle Pennock, had been a general agent of the Equitable Life Assurance Society, and most of the commissions in question accrued pursuant to a written contract made in 1906 between him and the Equitable.  He also had somewhat similar contracts with nine other insurance companies but the amounts accruing therefrom are relatively small.  The Equitable contract provided that Mr. Pennock would be entitled to specified percentages of the first fifteen yearly premiums paid by persons insured under policies procured through his agency.  Thus on straight life policies written by him or his office he was to receive a fifty per cent commission on the first year's premium and so-called "renewal" commissions at seven and a half per cent between the second and tenth years, and

at five per cent from the eleventh to the fifteenth year. After his death commissions were subject to a one per cent collection charge. Contracts with the other insurance companies similarly provided for a high commission on the first year's premium and renewal commissions at lower rates for the next succeeding nine yearly premiums. Such commissions in all the contracts were payable at the agreed percentages while the premiums were being paid during the specified terms; payment of commissions ceased before the end of the terms if the insured died, the policy lapsed, or was surrendered. These contracts are the principal assets of the residuary estate.

By his will executed March 31, 1933, after bequests of fifty dollars to each of his two children and all his tangible personal property to his wife, the testator bequeathed the entire residue of his estate in trust to pay his widow the net income thereof during her life; on her death the testator directed that the corpus be divided into two equal parts and the income from each part be paid to each of his children during their respective lives with remainders over. The will expressly authorized the executors and trustee to retain as investments for the trusts created " any of the securities or property " in which the estate was invested at the time of testator's death " until in their discretion they shall deem it advisable to dispose of them, hereby relieving them from all responsibility and liability for loss in so doing;" upon the sale of such " securities " the testator directed the proceeds to be invested in securities legal for trust funds. He also directed that all stock dividends received by the trustee be held as part of the corpus of the trust estate.

Under the terms of a living trust made in April, 1928, and amended in June, 1929, Mr. Pennock transferred securities (worth about $73,000 at the time of his death) to the trustee subsequently designated in his will, in trust during the life of his wife on substantially the same terms and for the same beneficiaries and ultimate remaindermen as the testamentary trust, except that during his own life he reserved a life estate for himself, and his wife's life interest was conditioned on her living (after his death) for not more than two weeks in any year with any relative except the children. Originally he gave the trustee discretionary authority to apply not more than $2,500 per annum of the trust capital to his wife, but by an amendment in June, 1929, he directed that after his death " the trustee shall apply to her " each year out of the principal of the trust so much as, with the income and the income or principal paid her under any other trust testamentary or otherwise, would " aggregate each year the sum of $15,000."

Appellant contends that the contracts under review are so-called " wasting " assets, that is, property that terminates or necessarily depreciates in course of time either because of the nature of the interest or the character of the subject-matter of the interest (Restatement, Trusts, § 239, p. 722; Scott, Trusts [1939], § 241.4); that of necessity the renewal commissions diminish in amounts annually until all payments cease; and that as no contrary intent was expressed in the will, the proceeds from such assets should be ratably apportioned between income and principal. The special guardian, representing the infant respondents, contends that the surrogate properly held the commissions were not wasting assets but were comparable to payments on a debt of the deceased payable in installments after his death for work and services fully completed at the date of death, and were accordingly wholly capital.

The celebrated case of *Howe* v. *Earl of Dartmouth* (7 Ves. Jr. 137; 32 Eng. Reprint, 56 [May, 1802]) established the rule that where personal property is given generally (as contrasted with specifically) or given under a residuary bequest to one for life with remainder over, the court in the absence of language or circumstances pointing to the contrary will assume that the testator intended both life tenant and remaindermen to enjoy his bounty, each having successive interests in one and the same thing, and will not permit the life tenant to enjoy the property in specie where any part of the residue is of a wasting nature, such as long annuities or leasehold estates; but in order to effect the general purpose of the testator, such wasting property must be sold and converted into permanent securities and the life tenant given dividends or interest thereon, the corpus to go to the remaindermen at the termination of the life estate. In that case the estate consisted in part of long annuities and short annuities, and the deceased had bequeathed his property to successive life tenants with remainder over. The rule has been frequently applied but often mitigated to permit that the court decree an equitable conversion and fix the value of the assets as of the date of death so as to determine a fair return without the necessity of actual sale and reinvestment. (See cases annotated in 77 A. L. R. 753, 762 *et seq.;* 109 id. 234 *et seq.*)

In *Cairns* v. *Chaubert* (9 Paige, 160) the assets included a twenty-nine-year interest in a bridge and leasehold property on which a toll house was constructed. The court held that the bridge and franchise with the improvements should be valued at what they were worth in cash immediately after the testator's death and the executrix allowed interest on that amount out of the tolls or income for life, but the residue should be added to the capital of the fund so as to place the remaindermen in the same position as if the bridge

property had been sold and converted into permanent capital within the year after testator's death.

In *Matter of Elsner* (210 App. Div. 575, 579, 580) it was held that royalties received by an executor after the testator's death on a book written by him and published under a contract providing for the payment of royalties must be apportioned by the executor between principal and income. There the Fourth Department said: " We think the property represented by the contract and the royalties can and should be apportioned between capital and income. Not only does the statute justify such a solution, but the practice has long been recognized and adopted in analogous cases, both in this and other jurisdictions. [Citing cases.] "

The court also held that experienced publishers could make as fair an estimate of the value as could expert appraisers of real estate and personal property; that the royalties should be apportioned between principal and income and stated the reason for its ruling as follows: " To hold that the entire proceeds are principal would be to deny that the capital earns any income; to hold that the royalties are entirely income, leads to the result that a capital sum must become eventually unproductive and valueless. Either theory results in injustice, and we are not inclined to adopt either the one or the other."

In *Frankel* v. *Farmers' Loan & Trust Co.* (152 App. Div. 58; affd., 209 N. Y. 553, on the opinion of SCOTT, J., of this court) the decedent left certain leaseholds which became part of his trust estate, and the issue was whether payments under the leasehold were income or principal. We said: " It is no doubt a general rule that where trustees or executors find a portion of the estate invested in what are termed ' wasting ' securities, they should pay to the life tenant only so much of the income as represents a fair return upon the capital value, accumulating and retaining the residue for the benefit of the remaindermen. (*Howe* v. *Earl of Dartmouth*, 7 Ves. Jr. 137; *Cairns* v. *Chaubert*, 9 Paige, 160; *Kinmonth* v. *Brigham*, 5 Allen [Mass.], 270.) " In that case, as there was an express direction in the will that the life tenant be favored, the entire proceeds of the leaseholds were paid to the life tenant.

In *Rubenstein* v. *Rubenstein* (221 App. Div. 612), cited by the learned surrogate, the deceased in his lifetime owned a twenty-one-year lease which he had sold at an increased rental. It was held that the annual payments to the estate after the testator's death constituted principal only. But there the leasehold had been sold before the testator's death and the estate was merely receiving installment payments from such sale consummated by the testator before his death, and not the proceeds of the lease itself. The

court said: " The lease was an estate for years and like an estate in fee or an estate for life was alienable. The testator sold it. His interest therein ceased. * * * Had the purchase price of the lease been paid in a lump sum obviously it would constitute part of the corpus of the estate. It makes no difference that the purchase price instead of being paid at one time is paid in annual installments." In this case the testator had not sold the contracts during his life and permitted their retention as part of the trust after his death. These installment payments are commissions receivable for definite periods of time and constantly diminish as such time progresses until they terminate. They partake of the nature of wasting assets.

In the light of all the facts, including the purposes of the trust and the relationship of the parties, we think the widow's claim that there should be an apportionment of the value of the renewal commissions between principal and income is reasonable and should have been sustained, and that the learned surrogate erred in holding the commissions wholly capital. It is true that in the *Earl of Dartmouth* case and in other cases referred to in the surrogate's opinion, the rule was applied to protect remaindermen, whereas here it is being invoked by the life tenant. But the reason for the rule, its fundamental basis in justice and equity, sustains the life tenant's claim and makes the rule applicable. That reason is to do justice and deal fairly with both life tenant and remaindermen and give effect to the testator's intention that both shall enjoy the same thing. Apportionment should be made to give to each of the parties a fair and equitable share of the fund the testator intended both should enjoy.

In *Industrial Trust Company* v. *Parks* (57 R. I. 363; 190 A. 32 [1937]) the Supreme Court of Rhode Island held that precisely similar assets, viz., commissions accruing from renewal premiums on life insurance policies, part of a testamentary residuary trust for the benefit of one for life with remainder over, were neither entirely principal nor entirely income but were in the category of " wasting assets " and should be apportioned between principal and income, the life tenant receiving not the commissions as such but the income or interest on the value thereof as of the testator's death. In that case the commissions diminished so that they terminated within ten years after testator's death. The Supreme Court in a comprehensive opinion cited with approval and quoted extensively from *Matter of Elsner* (*supra*) and held the reasoning so convincing and the facts so similar that a similar result should be reached and directed an apportionment.

In the final analysis the testator's intention controls. The rule as to wasting assets yields to an expressed contrary intention. But in this will there is no express direction with respect to the receipts from the property. The prevailing view is that in the absence of any indication of a contrary intention the inference is that the life beneficiary is not intended to receive the whole of the proceeds of wasting property. (*Frankel* v. *Farmers' Loan & Trust Co.,* *supra;* 2 Scott Trusts [1939], § 241.4, p. 1379.) The opposite view that in such case the remainderman is entitled to the whole of the property as if it were all capital is obviously neither a proper nor reasonable inference. The will permits retention or sale in the untrammeled discretion of the trustee; and the special guardian contends that such permissive retention is nullified by a decree of fictional conversion. On the contrary, an intention not to convert has been held to entitle the life tenant to enjoy the property or its income in specie. (See cases annotated in 77 A. L. R. at p. 774; Restatement, Trusts [1935], § 239, subd. e, p. 724.) The asset in question being personalty and partaking of the nature of a "wasting" asset, we think from the context of the clause in the will that the permission to retain or sell merely indicated the testator completely relied on the good judgment and discretion of his trustee to realize either by sale or retention the highest possible value from his residuary estate for the benefit of both life tenant and remaindermen as in the same clause the testator immediately exonerates the trustee from any liability whatever for loss whether the asset was sold or retained.

By reason of debts and other administration expenses appellant contends that if the present decree be permitted to stand, the widow, primary object of the testator's bounty, would be deprived of any beneficial interest in the trust created for her benefit for a period of four years after the testator's death. It is obvious that for a time at least she would receive a slight benefit since by the decree she is allowed only the subsequent income from the commissions received as and when they have been reinvested. During such time she must support herself and her infant children, respondents herein. We think that such result was never intended by the testator nor did he intend that for the support of his widow and his children during such period she should have to rely on and invade the principal of the living trust.

We think the value of these assets as of the date of the testator's death can be ascertained with sufficient accuracy to permit a proper apportionment. At the hearing before the surrogate the unit chief in the auditing department of the Equitable Life Assurance Society testified that $85,000 was the fair and reasonable

value of the Equitable contract. The exact valuation arrived at on the company's actuarial experience was $88,919, but in accordance with the company's policy it was fixed at $85,000 so that the estimate would be conservative. The other contracts are valued at fifty per cent of the gross commissions payable. The executors set forth such present value of all the contracts in Schedule A of their account and there were no objections filed to such valuation totaling about $87,000. The method used for evaluating these renewal commission contracts is used by the Equitable to establish credit for agents who wish to sell or hypothecate their future renewal commissions and has been accepted by banking institutions and taxing authorities both State and Federal. The decree appealed from allowed executor's commissions thereon.

The total of all commissions payable under the Equitable contract is $157,153.71; under all the contracts, $160,776.29. It is practically conceded that the collections of commissions will far exceed the commuted value contended for by appellant, of approximately $87,000. Up to August 29, 1939, three years and nine months after testator's death, the executors have actually collected on the Equitable contract $63,251.63 and on all the contracts $66,546.30. On the Equitable contract alone commissions are apparently receivable for eleven additional years. On this record, therefore, we deem the value claimed by appellant to be established as fair and reasonable.

Assuming the reasonable valuation of the contracts to be $87,135.32, appellant asks a four per cent return thereon, amounting to $3,485.41, which the life beneficiary should receive per annum, and she asks that from commissions received during the first year from the date of death a sum equal to such amount be paid appellant. As the balance is to be allocated to principal and reinvested, appellant concedes that the income apportionment from commissions received should be reduced by a sum equal to the actual income received by the beneficiary from the capital when invested, and also concedes that if and when the invested capital from these assets produces an annual return equal to the amount determined to be a reasonable return on the original investment, no further apportionment is necessary. In view of the relationship of the parties, the purposes of the trust, and the other facts and circumstances disclosed in this record, we think appellant's method of apportionment above outlined achieves an equitable result and should be approved, and that an apportionment should be made of the commissions in the manner above outlined. Subject to the above-stated provisions with regard to income received from the capital when actually reinvested, the widow, life beneficiary and

primary object of the testator's bounty, should receive a sum equal to four per cent per annum from the date of testator's death upon the sum of $87,000 taken as the commuted value of the assets in question as of such date.

It is unnecessary to attempt to state a formula applicable to all cases. The intent of the decision is not to lay down a formula of apportionment applicable to all trusts containing wasting assets of this nature. The decision is based on the facts of this record and on appellant's concessions as to the method of apportionment between life tenant and remaindermen.

The decree, so far as appealed from, should be reversed and the matter remitted to the surrogate to apportion the commissions between beneficiary and remaindermen in accordance with this opinion.

MARTIN, P. J., O'MALLEY, TOWNLEY and UNTERMYER, JJ., concur.

Decree, so far as appealed from, unanimously reversed and the matter remitted to the surrogate to apportion the commissions between beneficiary and remaindermen in accordance with opinion. Settle order on notice.