## McGILL v. HOLMES, BOOTH & HAYDENS.

(Supreme Court, Appellate Division, First Department. February 23, 1900.)

1. PATENTS—CONTRACT FOR ROYALTIES—CONSTRUCTION.

> An agreement recited that plaintiff was the sole owner of certain patents, and was desirous of making and selling articles made thereunder, and similar ones to be hereafter devised and patented by him, and provided that defendant should have the sole right to manufacture the same; that the prices plaintiff then paid another manufacturer for making these goods, a list of which was attached as an exhibit, and included articles not patented, should be a basis for computing the royalties to be paid therefor; and that the goods should be similarly made and packed. *Held*, that the recital was for the purpose of giving defendant a license to manufacture the articles covered by patent, but did not limit those on which royalties were to be paid, and hence plaintiff was entitled to recover royalties on articles made and sold by defendant, whether the same were patented or not.

2. SAME—INVALIDITY OF PATENTS—DEFENSE.

> A claim that plaintiff had misrepresented that he had valid patents on articles included in an agreement for royalties on their manufacture and sale, and had failed to sustain their validity, was not a defense to an action to recover the royalties, where it was admitted that some of the patents under which the articles were manufactured were valid.

Appeal from judgment on report of referee.

Action by George W. McGill against Holmes, Booth & Haydens. From a judgment in favor of plaintiff, defendants appeal. Affirmed.

The following is the opinion of the referee (WILLIAM G. CHOATE):

This is an action brought by the plaintiff to recover of the defendant the plaintiff's share of the profits on the sales of certain goods alleged to be due to the plaintiff under the terms of a written agreement entered into between said parties on the 23d of March, 1876, as amended by an agreement of July 24, 1883, and by two other agreements, both dated February 19, 1894, of all of which copies are annexed to the complaint. By a stipulation between the parties to the action, the only question involved, and to be decided, is whether the defendant is bound to pay to the plaintiff royalties or a share of the profits on such sales for the months of April, May, and June, 1897, on goods known as "flat and round head fasteners"; and it is further stipulated between the parties that, if the defendant is so liable, the amount to be recovered is $1,158.34 for said period. That the parties entered into the written contracts, copies of which are annexed to the complaint, and that the defendant manufactured flat and round head fasteners during said period, are admitted facts in the case. It is contended by the defendant that it is not liable under said contracts, because the original patent on said fasteners expired in the year 1883, and the defendant did not, during the term for which the royalties are sought to be recovered in this action, use any patented invention of the plaintiff applicable to said fasteners, and that, if it used any of the inventions described and claimed in the plaintiff's patents which had not expired on the 1st of July, 1897, those subsequent patents are void on their face for want of invention; that they do not secure or control anything; and that the defendant has not, in said agreements, promised to pay royalties or share of the profits, except upon fasteners and suspending devices secured by the patents mentioned in the contract, or secured by subsequent patents issued to the plaintiff.

(1) The first question involved in this case is, what goods are included within the promise to pay royalties, or a share of the profits, in said agreement, and is that promise to pay royalties limited to goods actually secured and controlled

by patents then issued or thereafter to be issued to the plaintiff? The original agreement of 23d March, 1876, recites that the plaintiff is the sole owner of certain letters patent issued to him July 24, 1866, for a metallic fastener, and also the sole owner of several letters patent of a subsequent date, issued to him for elaborations and modifications of such fasteners, all of which subsequent patents are subordinate to and controlled by the letters patent of July 24, 1866. It further recites that the defendant is desirous of making and selling, both in the United States and foreign countries, all of said fasteners and other articles made under said patents, and all articles made in the similitude of said fasteners, which the said McGill has now or may hereafter devise or patent. Then follows the agreement. The first article of the agreement was as follows: "First. Said Holmes, Booth & Haydens are to have the sole and exclusive license and right to manufacture all of McGill's fasteners and suspending devices secured and controlled by the before-mentioned patents, or which may be secured by subsequent patents issued to McGill." The eleventh article of the agreement is the one which provides for the payment of a share of the profits, as follows: "Eleventh. Holmes, Booth & Haydens are to keep a separate set of books, in which shall be entered all transactions relating to the stock and sales of these goods, and shall render monthly statements to the said McGill of sales of.the same, and shall, during each month, in preparing said statements, deduct the price paid for manufacturing the goods sold the preceding month from the net amounts for which they were sold, and shall each month place three-fourths of the balance to the credit of the said George W. McGill, as his royalty, and subject to his order, except on such of said goods as they may have shipped out of the United States to foreign countries, and upon such shipments or sales his royalty is to be one-half the balance ascertained as aforesaid. The said books shall at all reasonable times be open and subject to the inspection of the said McGill or his agent."

The defendant insists that the words "these goods," in the eleventh article, are limited to and cover only the goods described in the first article, namely, "fasteners and suspending devices secured and controlled by the before-mentioned patents, or which may be secured by subsequent patents issued to said McGill." If the defendant were right in this proposition, then it would seem to be necessary for the plaintiff to establish, as part of his case for a recovery under the written contract, that, during the quarter for which this action is brought, flat and round head fasteners manufactured by the defendant were secured and controlled by subsequent patents issued to the plaintiff, since the original patent under which they were made had long since expired. Upon a careful consideration of all the terms of said agreement and the amendments thereof, I think the words "these goods," in the eleventh article, cannot be confined or limited to the goods referred to in the first article. The agreement provides, in the second, third, fourth, fifth, and sixth articles, for the terms on which the goods are to be manufactured; and in the seventh, eighth, ninth, and tenth articles it provides for the terms and conditions on which the goods shall be sold. The office of the first article was to secure to the defendant the sole and exclusive license and right to manufacture goods under McGill's patents. It appears by a later clause—the fourteenth—that a separate license was given, and it is therein recited that the agreement is based upon that license. The third article, which relates to the prices which the defendant is to be allowed for the manufacture of the goods, is as follows: "Third. The prices which the said McGill now pays D. M. Somers for the manufacture of said goods, a list of which is hereto attached, marked 'Exhibit A,' shall be considered a proper basis to commence upon; and such prices shall not be altered to pay more than the profit on manufacture above stated, based upon brass at the foregoing rate." While it is true that the words "said goods," if there were nothing else in the contract to control their meaning, would necessarily relate back to the goods described in the first article, namely, goods of a certain description secured or controlled by certain patents, yet the words in the third clause are followed by the words, "a list of which is hereto attached, marked 'Exhibit A.'" This list, Exhibit A, is as much a part of the contract as if it had been in terms embodied in the third article. It is headed "Prices Which D. M. Somers has been Charging George W. McGill for Making His Fasteners," etc. It enumerates flat heads, 9 numbers; round heads, 9 num-

bers; eyelet T-binders, 4 numbers; miscellaneous fasteners, 3 numbers; suspending braces, 4 numbers; suspending rings, 3 numbers. It is shown by the evidence that, of these various goods enumerated, some were not secured by any patent. I think the fair construction of the third clause is that all of the goods so made by Somers are covered by the contract, and are the class of goods as it existed at the time of the date of the contract which the defendant undertook to manufacture and sell. These, also, were the goods referred to in the fourth clause: "Said Holmes, Booth & Haydens are to make the goods, in quality and finish, as good as they are now being made by D. M. Somers, of Greenpoint, N. Y., samples of which McGill is to furnish, and to pack them similarly." While the recital in the contract that the defendants are desirous of making and selling all of said fasteners and other articles made under said patents, and all articles made in the similitude of said fasteners which the said McGill has now or may hereafter devise or patent (that is, which he has. heretofore devised or patented, or which he may hereafter devise or patent), would not control the construction of the contract, if in terms it were limited to a particular part of the articles which the defendant thus says 'it is desirous of making and selling, yet the provisions of the third and fourth articles are to be interpreted in the light of that recital; and, so interpreted, I think the contract included and covered some unpatented goods, and that the class of goods embraced within the contract as those which the defendant was to manufacture and sell is not limited to the class of goods referred to in the first article, which provides for a sole and exclusive license. A license to manufacture and sell goods covered by patents (that is, to use the patent invention) was necessary, or at least is a usual and proper part of such an agreement, when all or any of the goods to be manufactured are patented; and, so far as the patents prior to the date of the contract are concerned, the license to manufacture under the patents is expressly covered by the agreement, and the separate license contemporaneously executed was a license to manufacture and sell. It is not necessary, therefore, as it seems to me, to refer to the acts of the parties under this agreement after its execution, in March, 1876, for the purpose of showing that some unpatented goods were within its scope and meaning; nor is there anything, in my judgment, in the other parts of the original agreement, or in the agreements amending the same, which controls this construction, or limits the scope of the agreement strictly to patented goods, or particularly to the patented goods described in the first article, which, as will be seen, constitute but a part of the goods patented by the plaintiff. The office of the first article would seem to have been to protect the defendant against being an infringer of the plaintiff's patents, and for this purpose there was no occasion for extending the description of the goods referred to in the first article beyond the patented goods. The office of the second and subsequent articles was to regulate the manufacture of the goods that were intended to be within the contract, and it is in these sections that we naturally look to ascertain what the goods to be manufactured are to be. Both the third, fourth, and fifth articles refer to an existing business carried on by the plaintiff in goods manufactured for him by Somers; and the goods so manufactured include, in fact, some unpatented goods, although the bulk of the business was then, and always has been, in what were known as "flat heads and round heads," which then were patented goods. The license referred to in the contract as the basis of the agreement gave the defendant a right to manufacture and sell, not only fasteners and suspending devices such as are referred to in the first article, but also punches for perforating paper and presses for attaching paper fasteners, neither of which can properly be described as fasteners and suspending devices. There would seem to have been no object in including these articles in the contemporary license, on which, as is said in the contract itself, the contract is based, unless it was intended to include them also in the goods to be manufactured and sold.

It may well be assumed that the reason why the first article gave to the defendant sole and exclusive license and right to manufacture the plaintiff's fasteners and suspending devices secured and controlled by the before-mentioned patents, or which may be secured by subsequent patents issued to the plaintiff, was because the principal part of the business was in fasteners, and the principal patents, or most valuable, which at that time the plaintiff owned,

were the original patent for a fastener, of July 24, 1866, and some later patents for improvements thereon, which are expressly referred to in the recital of the agreement. The agreement throughout is inartificially and somewhat carelessly drawn, as appears by the discrepancy between the license contained in the agreement itself and the separate license above pointed out, and by other vague and uncertain expressions of the intention of the parties, which have resulted in other litigated questions between them.

The part of the fourteenth article which by the agreement of July 24, 1883, was stricken from the contract, does not, in my opinion, require a different construction of the third article. This fourteenth article, after providing that the agreement should continue for twenty years, subject to the right of the defendant to terminate it at the expiration of ten years by surrendering to the plaintiff, his heirs or assigns, all the defendant's interest in said business, on certain terms, embracing the goods on hand at cost, and, at the option of the defendant, such special tools and machinery as may be connected with the manufacture of the goods, and providing that the defendant should then desist from the further manufacture and sale of said goods, provided: "And after the expiration of the letters patent of July 24, 1866, or any reissue or extension thereof, the royalty to be paid the said McGill on the goods formerly made under that patent, and which may be made under the remaining letters patent referred to in this agreement, and the license upon which it is based, of even date herewith, shall be a sum equal to one-half of the net profits arising from sales of all the goods specified herein, as ascertained under the articles of this agreement." If this clause had not contained the words, "and the license upon which it is based, of even date herewith," and had continued to the present time a part of the agreement, it might well be claimed, as to the flat heads and round heads, which were made originally under the letters patent of July 24, 1866, that it was a condition of the payment of royalty thereon that they should be made under the remaining letters patent, including patents subsequent to the date of the agreement, but in point of fact this clause of the contract never went into effect. At the very moment when it would have taken effect it was, by the subsequent agreement of the parties, stricken from the agreement; and the only importance of it in the present inquiry is that it was in the agreement at the time it was executed, and may therefore be referred to as showing what was then the intention of the parties in regard to the class of goods covered by the agreement. While it may have some tendency to show an intention to pay royalty only on patented goods, I do not think it can control the provisions of the third article. It appears also by this clause itself that even after the expiration of the letters patent of July 24, 1866, royalties were still to be paid upon goods made under letters patent referred to in the license, which included goods other than those made under letters patent of July 24, 1866, and the remaining letters patent referred to in the agreement, which are patents for the elaborations and modifications of the fastener, subordinate to and controlled by the patent of July 24, 1866, or subsequent patents on fasteners and suspending devices. The reason for expunging this clause from the contract on the day on which it would have taken effect is not given in the amendatory contract, nor does it anywhere appear. It must be presumed that it no longer expressed the intention of the parties. The very contract which expunged this clause provides that inventions covered by patents then owned by McGill for fastener presses, fastener punches, and staple presses, among others, should be brought within and covered by the terms of the agreement. This could only mean that they were among the goods to be manufactured and sold under the agreement. All of these, except that for staple presses, are enumerated in the license originally given, and no motive for including them in the license is suggested, except to make them subjects for manufacture and sale under the contract. Now, these goods were in no sense such as are described in the first article of the agreement. Thus, this very clause has a strong tendency to show that, within the intention of the parties, the goods to be manufactured and sold were not limited to these particular goods referred to in the first article; nor can it be said that those other goods mentioned in the license, not in any sense fasteners or suspending devices, were formerly made under the patent of 1866. Therefore the introduction of this reference in this clause to royalties on goods made un-

der the patents referred to in the license compels some departure from the literal meaning of the clause which would literally import that these goods, as well as fasteners and suspending devices, were so formerly made.

(2) It is insisted by the defendant, also, that these subsequent patents of 1883 and 1893, which are the only subsequent patents on fasteners relied upon as in force in 1894, are void on their face, and that, upon a fair interpretation of the contract, it is not liable to pay royalties on flat heads and round heads unless protected by valid patents. I assume in the consideration of this question that the patents of 1883 and 1893 are void for want of invention. It is, indeed, very difficult to see the exercise of the inventive faculty in making the feet of the fastener of unequal length, to enable them to penetrate the paper more easily, or in having the feet taper more uniformly for the same purpose, as provided in the patent of 1883, or in folding the metal on itself less closely, to prevent its rupture, as in that of 1893. I also assume (for such, I think, is the clear weight of the evidence) that the defendant did not in fact use the inventions described in either of these patents in the manufacture of the flat heads and round heads in the year 1897. They were made in accordance with the invention described in the expired patent of 1866. The use of the word "royalty" in the contract is not conclusive upon this question. It is simply a circumstance tending to show that the stipulated compensation was intended as a compensation for the use of a patent; and I think the use of the word in this contract as another term describing a share of the profits, considering that the contract covered patented and unpatented goods, is explained by the circumstance that the great bulk of the goods were believed to be covered by patents. There is no express provision in the contract that, upon the expiration of a patent upon particular goods embraced within the contract, the royalty as to such goods shall cease, or that, in case of the invalidity of a patent claimed to cover said goods, the defendant is excused from paying the royalty. If the foregoing view of the agreement is correct, then the case is not a case of a simple license to use a patent, the entire consideration of which fails if the patent fails, and the license does not secure the exclusive use which it purports to give. The entire share of the profits or royalty payable as well on patented and unpatented goods is the consideration to be paid by the defendant for all the concessions made by the plaintiff. The fourteenth article of the original agreement, and the first of the two amendments executed on the 19th of February, 1894, contain provisions which clearly show that the business is to be treated as a whole, and when it comes to an end by the expiration of time, or by the notice to terminate, the whole business is to be turned over to Mr. McGill, as his business, together with certain tools and certain machinery, and that thereupon the defendant shall discontinue the manufacture. These provisions are, in my opinion, inconsistent with the claim of the defendant that it may still go on with the business, and refuse to pay the royalty, on account of the failure of any particular patent, and these provisions also answer the objection made by the defendant that the plaintiff nowhere agrees, on unpatented goods, not to manufacture and sell himself. It is true, there is no such express covenant, but it is clearly implied that while the defendant is acting under the contract the plaintiff is not to do so, and, when the defendant gives up the right to do so under the contract, he is to give up the business, and the plaintiff may then, and not till then, resume it; and, therefore, if the patents which are supposed to cover particular goods should fail, it would, at most, be a partial, and not an entire, failure of consideration. By one of the amendatory agreements of February 19, 1894, the defendant expressly undertook and agreed "to bill flat and round head fasteners at ten per cent. less than the present factory cost prices, as now rendered, till the selling price shall be restored to within seventy-five per cent. of the original selling price." This clearly implies that, within the understanding of both parties at that time, flat and round head fasteners were within the terms of the agreement, and thereby the defendant impliedly undertook to pay royalties thereon, yet at that time the situation was exactly what it is at present with respect to the invalidity of the patents of 1883 and 1893. If they are void on their face for want of invention now, they were void for want of invention then. It is urged that this stipulation in this contract of 1894 was procured by Mr. McGill by mis-

representation in regard to those patents; that he had represented and induced the defendant to believe that these patents were valid. If the defendant has a case against the plaintiff for annulling the agreement of 1894 by reason of mistake or fraud, that question is not involved in the present case. That is not an issue set up by the pleadings. So, also, it is urged that the defendant was bound by the contract to sustain the validity of his patents at his own expense, and that in respect to these patents he has failed to do so. This would seem, under this contract, to be a ground for damages, rather than an excuse or defense against the claim for the stipulated compensation of the contract. It is not claimed by the defendant that all the patents of the plaintiff have failed in respect of all the goods manufactured by the defendant during the period in question. By the stipulation between the parties, a very substantial sum is due upon other goods upon which the patents are admitted to be valid, sold during this same period. If, however, the meaning of the contract is fairly doubtful with respect to the goods embraced within its scope, the evidence of the acts of the parties in the course of its performance fully sustains the plaintiff's claim.

(3) The view above taken of this contract does not involve the question of the obligation of the defendant to manufacture and sell any possible article of the general character described in the recital of the contract which the plaintiff may from time to time devise or patent. If such a construction were necessarily involved, it might perhaps be urged that the effect of such construction might be ruinous to the defendant, and could not possibly have been within the intention of the parties. It appears by the evidence that when special goods were ordered, which had not been recognized before as within the contract, a new parol agreement was made with regard to them,—that they should be made and sold in accordance with the terms of the contract. As to such special goods, this would not necessarily imply that such an arrangement thus made by parol in regard to such special goods should be perpetual, or for the life of the contract. It may well be that all such agreements are terminable by either party at any time. The question in this case is whether flat heads and round heads manufactured and sold by the defendant are within the terms of the agreement as extended by the contract of 1894, and the point decided is that they are, and that the defendant is not excused from paying royalties thereon by reason of the invalidity of the patents of 1883 and 1893, if they are invalid, nor by reason of the fact that the defendant did not see fit to employ in their manufacture the inventions, if any, covered by those patents. If the defendant is bound to pay the royalties on flat and round heads manufactured and sold by it, it obviously cannot relieve itself from that liability by the particular mode in which it makes them.

(4) The defendant sold the goods to which this suit relates as "McGill's Fasteners," and referred on the packages to the patents dated 1883 and 1893, and thereby represented that the goods were covered by those patents. It is unnecessary to determine whether this fact alone would entitle the plaintiff to a judgment, without regard to the question of the use of those patents, or their validity. It certainly cannot be said that in 1897, after the plaintiff had been excluded from the premises of the defendant and their relations had become unfriendly, and the defendant had taken independent advice as to its rights under the contract and as to these patents, the plaintiff was responsible in any way for the representations under which the defendant saw fit to sell these goods. From 1895 forward the relations between the parties were such that these representations with regard to patents were the acts of the defendant alone. In the view that I take of the case, it is unnecessary to determine whether the defendant is right in its contention that this reference to the patents on the boxes was a mere statement of fact, which the defendant was at liberty to show to be untrue, whereby the plaintiff was in no sense injured, or whether, as claimed by the learned counsel for the plaintiff, these facts would constitute something in the nature of an estoppel, or an election which would prevent the defendant from setting up the defense of the invalidity or the nonuser of the patents in the manufacture of the goods. The plaintiff is entitled to judgment for the stipulated amount, $1,158.34, with interest from the 1st day of July, 1897.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, O'BRIEN, and INGRAHAM, JJ.

J. E. Parsons, for appellant.
H. G. Atwater, for respondent.

PER CURIAM. Judgment affirmed, with costs, on opinion of referee.

---

(31 Misc. Rep. 543.)

## In re DARLING.

(Supreme Court, Special Term, Kings County. May, 1900.)

1. DISCOVERY—EXAMINATION OF DEFENDANT BEFORE SUIT BROUGHT.

Under Code Civ. Proc. § 870, authorizing an adverse party to take the deposition of a person whom he expects to make a party to an action, before suit brought, an order may be granted to the plaintiff to examine a person against whom he intends to bring an action to obtain facts necessary to draw his complaint.

2. SAME—AFFIDAVIT—REQUISITES.

Under Code Civ. Proc. § 872, providing that one desiring to take a deposition where no action is pending shall make an affidavit giving the names and addresses of expected parties to the action, that the expected defendants are of full age, and that the testimony sought is material and necessary, where an affidavit failed to state that the expected defendants were of full age, and the affidavit was made by the attorney, and did not disclose why plaintiff did not make it, or that the facts sought were not within his knowledge, leave to take the deposition should have been refused.

Application by Bryant F. Darling for the examination of Samuel F. Randolph preliminary to bringing an action against him. Motion to vacate an order granting the application. Granted.

Motion to vacate an order obtained by the applicant for the examination of Samuel F. Randolph, for the purpose of ascertaining who are the proper persons to make defendants, and also to enable the plaintiff to frame the complaint. The affidavit on which the order was obtained states among other things that the applicant expects to bring an action for damages for personal injuries against the said Randolph, and shows that he needs to examine him in order to ascertain whether he alone was liable, or whether he was acting for others in the matter constituting the negligence upon which the action was to be based.

Kellogg & Rose, for the motion.
Thos. J. Ritch, Jr., opposed.

GAYNOR, J. The objection that one who expects to be a party to an action about to be brought may not examine a person he expects to make an adverse party, for the purpose of ascertaining the persons who should be made parties to the action, or obtaining facts necessary to draw his pleading, is not well taken. Chancery, when a separate court, entertained bills for the discovery of such facts in respect of an expected as well as of an existing action at law; and its jurisdiction passed to the supreme court when the court of chancery was abolished. Const. 1846, art. 6, § 3. Such bills of discovery were thereafter enter-