COMMISSIONER OF INTERNAL REVE-
NUE v. AFFILIATED ENTER-
PRISES, Inc.

No. 2303.

Circuit Court of Appeals, Tenth Circuit.

Nov. 11, 1941.

Rehearing Denied Dec. 16, 1941.

666

Louise Foster, Sp.Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch and Harry Marselli, Sp. Assts. to Atty. Gen., on the brief), for petitioner.

Albert J. Gould, of Denver, Colo., for respondent.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

The question presented on this appeal is whether Affiliated Enterprises, Inc., the respondent taxpayer, for the years in question was a personal holding company within the meaning of Sec. 351 of the Revenue Acts

of 1934 and 1936, 26 U.S.C.A. Int.Rev.Acts, pages 757, 936, and therefore subject to the surcharge taxes imposed therein. The Board of Tax Appeals held that it was not, and the Commissioner has appealed.

The applicable portion of Sec. 351 of the Revenue Act of 1934 provides that: "The term 'personal holding company' means any corporation * * * if—(A) at least 80 per centum of its gross income for the taxable year is derived from royalties, dividends, interest, annuities, and * * * (B) at any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals."

C. U. Yaeger and Rick Ricketson evolved a scheme or plan designed to stimulate public interest in the motion picture · industry and increase attendance in motion picture theaters. The system was generally designated "Bank Night," although it was also operated under the names of "Cash Night," "Gold Night," "Surprise Night," and "Fortune Night." In 1933 the plan was incorporated under the name "Affiliated Enterprises, Inc." The authorized capital stock was 10,000 shares, of no par value. At the time of the incorporation, 100 shares were issued to Rick Ricketson, 100 shares to C. U. Yaeger, and 1 share to Emmett Thurmon. The only additional stock issued was on November 3, 1934, when 100 shares were issued to Clover Yaeger, wife of C. U. Yaeger, and 100 shares to Maizie Ricketson, wife of Rick Ricketson. The company did an extensive business from the beginning. Its total earnings for the years 1934, 1935 and 1936 were, respectively, $116,982.17, $364,-465.41, and $770,558.31. It appears conclusively that more than fifty per cent of the outstanding stock of the corporation was owned by not more than five persons. As a matter of fact, the entire outstanding stock was owned by five persons and of this, all but one share was owned by the two originators of the scheme and their wives. It remains, therefore, only to inquire whether at least eighty per cent of Respondent's income was derived from the sale of royalties, dividends, interest or annuities within the meaning of the applicable Revenue Acts.

Respondent described its system as the affiliated system and stated in its printed instructions that it was a system of advertising. The materials used in operating the system consisted of two registration books, cards, posters, and film trailers advertising

bank night. The system operated in the following way: Any person over sixteen years of age was permitted to register in a registration book in the lobby of the theater, without purchasing a ticket, and each name was assigned a number. Only one registration was permitted and transfer of names to a second registration book was made to prevent duplication of names. A sum of money was placed in an account in a local bank each week. The drawing night and other details were advertised during the program by film trailers. On the drawing night, a number was drawn on the stage from a box. The winner was announced, both outside and inside the theater, and the winner could enter the theater, without purchasing a ticket, and claim the money.

Respondent made application November 21, 1933, for a patent on "Means of Conducting Prize Drawings," but the application was rejected January 16, 1934. An amendment to the application was rejected April 11, 1935. Respondent had further applications for patents pending in 1937 and 1938. These also were rejected. Respondents did obtain copyrights on certain film trailers and instruction sheets, which described the system. These copyrighted articles were used in the operation of the system in 1933, 1934 and 1935. Respondent did not register the name "Bank Night" as a trade name with the United States Department of Commerce, but did register it in most of the states.

Respondent solicited agreements in writing with theater operators granting them the right to use its system in their theaters. The contract was designated "Bank Night License Agreement." It provided that respondent granted the licensee a limited license to use Bank Night, including the trade mark, copyrights and patents pending. It agreed to furnish licensee with cards, record books, posters, and film trailers. In addition, respondent gave advice and instructions in the use of the system and defended the licensees against legal actions arising from the use of the system. It published a bulletin giving information on matters affecting the use of the system and instituted a service giving advice to theater operators. In return, the licensee acknowledged respondent's ownership of the trade marks, copyrights and patents pending, and acknowledged that payment was given for the rights that respondent might have in the things mentioned. A majority of the contracts provided for the payment of a stipulated license fee of from five to ten dollars per week throughout the terms of the contracts. Respondent discontinued the licensing of its system in 1938 when a fraud order was issued against it by the Post Office Department on the grounds that its system constituted a lottery.

■ The Board seems to have based its decision on the ground that respondent had no property rights in its idea or system on which it could give licenses to others, because the system was not patentable. The test is whether the idea is new or novel and has value. Singer v. Karron, 162 Misc. 809, 294 N.Y.S. 566; Keller v. American Chain Co., 255 NY. 94, 174 N.E. 74; Soule v. Bon Ami Co., 201 App.Div. 794, 195 N.Y.S. 574; Haskins v. Ryan, 75 N.J.Eq. 330, 78 A. 566; Masline v. New York, N. H. & H. R. Co., 95 Conn. 702, 112 A. 639. A patent simply grants the exclusive right to the use of the creative idea. But the creative or novel idea would still have value and be subject to contract in the absence of a patent statute. When a patent expires, the creative idea does not cease to have value; it simply becomes the common property of all.

■■ Respondent contends that it was not the intent of Congress to include within the ambit of the statute an operating company, but only such companies as are pure holding companies. The Act is clear and unambiguous. It provides that it shall apply to companies which, among other requirements of the Act, receive at least eighty per cent of their income from royalties. It makes no distinction between companies that receive such income from active operation or simply from holding royalty payment contracts and receiving and distributing the payments. In Noteman v. Welch, 1 Cir., 108 F.2d 206, it was held that a corporation which received more than eighty per cent of its income from interest payments came within the holding company Act, notwithstanding that it was an operating company. Congress has laid down the pattern and it is only for us to determine whether petitioner falls therein. As was said in O'Sullivan Rubber Co. v. Commissioner, 2 Cir., 120 F.2d 845, 848, we may not by probing into corporate motives undertake to relieve from the alleged harshness of a particular application of the statute.

In each year in question, much more than eighty per cent of all money received by respondent came from license payments under these contracts. It remains, therefore, only to consider whether the payments may fairly be classified as royalty payments.

668

■ We are not so much concerned with the niceties of distinction in a razor-edged definition of the word "royalty" as with the reasonable import and construction of a taxing statute. Taxation is eminently practical. Tyler v. United States, 281 U.S. 497, 503, 50 S.Ct. 356, 74 L.Ed. 991, 69 A. L.R. 758. Nor are we so much concerned with a play upon words as we are with a reasonable construction of the Act that will effectuate a legitimate exercise of the essential governmental function of taxation. We must look through the form to the substance. Lucas v. Earl, 281 U.S. 111, 50 S. Ct. 241, 74 L.Ed. 731; Helvering v. Hallock, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368; Harrison v. Schaffner, 312 U.S. 579, 581, 61 S.Ct. 759, 85 L.Ed. 1055; Rotorite Corp. v. Commissioner, 7 Cir., 117 F.2d 245; Commissioner v. Buck, 2 Cir., 120 F.2d 775.

■ In general, "royalty" is defined as a tax or duty or compensation paid to owners of a patent or copyright for the use of it or the right to act under it. 2 Bouv. Law Dict., Rawle's Third Revision, p. 2975; Webster's International Dictionary. While payment ordinarily is at a certain rate for each article or certain per cent of the gross sale, that in itself is not determinative. The purpose for which the payment is made and not the manner thereof is the determining factor. And while we ordinarily think of royalty as payment for patentable or copyrightable articles, it is not necessarily required that the creative idea be subject to patent or copyright. In Volk v. Volk Mfg. Co., Inc., 101 Conn. 594, 126 A. 847, it was held that the term "royalty" applied to non-patentable improvements. To the same effect, see McGill v. Holmes, Booth & Haydens, 48 App.Div. 628, 64 N.Y.S. 787.

■ The departmental regulations define "royalty" as amounts received not only for the use of patents and copyrights, but for secret processes and formulas, good will, trade marks, trade brands, franchises, and other like property. This interpretation has appeared in all the departmental regulations. In the meantime, Congress has met a number of times without changing the interpretation placed upon the term by the department. Under these circumstances, the administrative interpretation given the term "royalty" must be deemed to have received legislative approval and is entitled to great weight.

Furthermore, it as apparent from the record that respondent in its dealings with theater operators treated the transaction as one involving the payment of royalty for the use of a creative, novel idea possessing utility. During all the years involved, it had pending applications for a patent and copyright. The trade name was registered in the states in which it operated. The contract was headed: "Bank Night License Agreement." It recited that respondent was the owner of the copyrighted and trade mark name, "Bank Night," and of certain copyrights and patents pending. It specifically stated that the intent of the agreement was to grant the licensee the right to use the copyright and trade mark name, "Bank Night," and all copyrighted articles. The parties at the time certainly thought they were dealing with reference to an idea subject to protection by patent or copyright, and that the transaction involved royalty payments. The fact that thereafter the applications for patent and copyright were denied did not change the nature of the transaction.

■ We have no difficulty in concluding that more than eighty per cent of respondent's income was derived from royalty payments or like payments within the meaning of Sec. 351 of the Revenue Acts of 1934 and 1936 and the administrative interpretation placed thereon by the department extending over a number of years, and that respondent meets all the tests of a holding company within the meaning of the Revenue Acts in question.

Reversed.

PHILLIPS, Circuit Judge (dissenting).

Approximately 86 per cent of the gross income of Affiliated Enterprises, Inc.,[1] in the year 1934, approximately 95 per cent of its gross income in 1935, and approximately 98 per cent of its gross income in the year 1936 was received from stated weekly payments of from $5 to $10 per week per theater and this income was not dependent upon the extent of the use of the advertising system by the theater. Nor was it dependent upon the amount of receipts collected by the theater as a result of the use of the system.

The taxpayer employed distributors in 26 key cities in the United States, who aided and instructed the theaters in the operation of the system. The taxpayer paid to the

---

[1] Hereinafter called the taxpayer.

distributors in 1934, $27,706.67, in 1935, $87,-224.30, and in 1936, $184,712.91. The taxpayer also agreed to furnish the theaters with the services of attorneys to defend them against lottery charges growing out of the use of the system. It employed 41 attorneys in approximately 30 cities in 1936. It expended for attorneys' fees in 1934, $5,846.-52, in 1935, $16,835.99, and in 1936, $33,594.-53. If a proper allocation of the amounts received by the taxpayer is made for the services of distributors and attorneys, 80 per cent of the gross income of the taxpayer for the years in question was not received for the use of the system.

Rent is a fixed sum or property amounting to a fixed sum to be paid at stated times for the use of property.[2] It is ordinarily demandable whether or not the tenant actually enjoyed the use and possession of the subject matter rented.[3]

In the law of patents and copyrights, the term "royalty" imports a share of the proceeds derived from the use of the patented device or process or the copyrighted article paid to the person having a proprietary or creative interest in the patent or copyright, or a share paid in proportion to the use of the patented device or process or the copyrighted article.[4]

In Western Union Tel. Co. v. American Bell Tel. Co., 1 Cir., 125 F. 342, 348, 349, the court said: "Royalties are commonly understood as meaning something proportionate to the use of a patented device; in other words, a kind of excise. * * * Rentals in their ordinary signification are not limited as royalties in their ordinary signification; that is, to something proportionate to the use of the patented device. The word 'ordinarily' means specific sums paid annually, or at other stated periods, for the right to use a patented device, whether it is used much or little or not at all."

Art. 351-2(1) of Tr.Reg. 86, promulgated under the Revenue Act of 1934, provides: "The term 'royalties' includes amounts received for the use of or for the privilege of using patents, copyrights, secret processes and formulas, good will, trade marks, trade

brands, franchises, and other like property. It does not include rents, * * * received by an operating company."

The same provision is found in Art. 351-2(1) of Tr.Reg. 94, promulgated under the Revenue Act of 1936.

Section 102 of the House Bill included in the 80 per cent clause, income from rents. The Senate Finance Committee struck out the word "rents." See Senate Finance Committee Rep., 73d Cong., 2d Sess., S.Rep. 558. The word "rent" was also omitted from the 80 per cent clause in § 351 of the Revenue Act of 1936.

The advertising system itself was not the proper subject of a patent or copyright.[5] Only film trailers, instruction sheets, and a special notice furnished to the theaters were copyrighted by the taxpayer. After September 1, 1934, the film trailers were not copyrighted.

The legislative purpose of § 351 of the Revenue Act of 1934 was to prevent tax avoidance by the device commonly called the "incorporated pocket-book," viz., a corporation formed by an individual who exchanges for its shares his personal holdings in stocks, bonds, or other income-producing property. By this means, while the income from the property is subjected to a corporation tax, a surtax against the individual is avoided by not distributing the income of the corporation.

The tax imposed is in the nature of a penalty.

The taxpayer is an operating company. It seems clear to me that it is not within the spirit of § 351 of the Revenue Acts of 1934 and 1936. Therefore, I do not think it should be held subject to the taxes imposed by those sections, unless it comes clearly within the letter thereof. It is my opinion that the income received by the taxpayer was more akin to rent than to royalties, and, therefore, not within the letter of the sections.

For these reasons, I think the decision of the Board of Tax Appeals should be affirmed and respectfully dissent.

---

[2] Duffy v. Central R. R., 268 U.S. 55, 63, 45 S.Ct. 429, 69 L.Ed. 846; M. E. Blatt Co. v. United States, 305 U.S. 267, 277, 59 S.Ct. 186, 83 L.Ed. 167; Int. Rev.Bull., Vol. XV, No. 17, April 27, 1936, Ruling No. XV, 17–80 57 Office Dec. IT 2970.

[3] Shepard Realty Co. v. United Shoe Stores Co., 193 La. 211, 190 So. 383, 388.

[4] In re Elsner's Will, 210 App.Div. 575, 206 N.Y.S. 765; Western Union Tel. Co. v. American Bell Tel. Co., 1 Cir., 125 F. 342, 348, 349; Riley Stoker Corp. v. Jeffrey Mfg. Co., 62 Ohio App. 199, 23 N.E. 2d 519, 521.

[5] Affiliated Enterprises v. Gantz, 10 Cir., 86 F.2d 597; Affiliated Enterprises v. Gruber, 1 Cir., 86 F.2d 958.