**AFFILIATED ENTERPRISES, Inc., v. COMMISSIONER OF INTERNAL REVENUE.**

No. 2762.

Circuit Court of Appeals, Tenth Circuit.

Jan. 20, 1944.

Albert J. Gould, of Denver, Colo., for petitioner.

Carlton Fox, of Washington, D. C. (Samuel O. Clark, Jr., Sewall Key, A. F. Prescott, and Muriel S. Paul, all of Washington, D. C., on the brief), for respondent.

Before PHILLIPS and MURRAH, Circuit Judges, and VAUGHT, District Judge.

MURRAH, Circuit Judge.

The question presented by this appeal is whether 80 per cent of the taxpayer's income for the taxable year 1937 was derived from "royalties" or "other like property", and consequently taxable as personal holding company income within the meaning of Section 351(b) of the Revenue Act of 1936, c. 690, 49 Stat. 1648, as amended by Section 1 of the Revenue Act of 1937, c. 815, 50 Stat. 813.[1] The answer depends on whether the principles an-

---

[1] The applicable portion of the Act provides:

"Sec. 351. Surtax on Personal Holding Companies. There shall be levied, collected, and paid, for each taxable year (in addition to the taxes imposed by Title I), upon the undistributed adjusted net income of every personal holding company a sur-

tax equal to the sum of the following:

\* \* \*"

"Sec. 352. Definition of Personal Holding Company. (a) General Rule.—For the purposes of this title and of Title I the term 'personal holding company' means any corporation if—(1) Gross income requirement.—At least 80 per centum of its gross

nounced by this court in a former case involving the taxpayer's income for the taxable years 1934, 1935 and 1936 is applicable to and controlling of the instant facts. Commissioner v. Affiliated Enterprises, Inc., 10 Cir., 123 F.2d 665, certiorari denied 315 U.S. 812, 62 S.Ct. 796, 86 L.Ed. 1211. The Tax Court held the facts here insufficiently different on principle to warrant a contrary result, and that accordingly the taxpayer fell within the statutory definition of a personal holding company for the taxable year 1937. By this appeal, the taxpayer does not attack the former holding as applied to those facts, but does contend that these facts, when applied to the principles announced there, requires a different result.

Affiliated Enterprises, Inc. (taxpayer and herein called Affiliated), was organized in 1933 to promote the sale of a plan or scheme called "Bank Night" to theater owners throughout the country. The plan was designed to stimulate theater business by encouraging attendance in the following manner: Any person over sixteen years of age who registered in the lobby of a theater using the plan was given a number. These numbers were placed in a box, and on an appointed night a number was drawn from the box on the stage of the theater, and the holder of the number drawn, if present, received a sum of money which had been placed in a special account in a local bank. "Bank Night" was advertised by means of cards, posters, and film trailers which Affiliated sold to the theater owners. The plan was immediately successful, and was used extensively throughout the country. Between 1933 and 1938, Affiliated made repeated attempts to obtain a patent on the "means for conducting prize drawings", but it was denied on the grounds that the art was not patentable. It did succeed however in securing copyrights on certain film trailers and instruc-

tion sheets which described the system, and the name "Bank Night" was registered as a trade-mark name in most of the states.

The plan was originally sold to theater owners throughout the country under a written agreement labelled "Bank Night License Agreement", which recited that Affiliated was the owner of the copyrighted and trade-marked name "Bank Night", and of certain copyrights and patents pending, together with other accessories such as cards, posters, registers, film trailers, record books, and instruction sheets used in the operation of "Bank Night". The theater operator was called a licensee, and the agreement recited that the licensee desired to acquire a limited license to use the "Bank Night" system in his theater. The licensee acknowledged Affiliated's ownership of the trade-marks, copyrights, patents pending, and further acknowledged that it was purchasing only the right to use that which Affiliated owned, and agreed to pay damages of $100 per day if it used the system or any modification thereof after the termination of the license agreement. Affiliated reserved the right to defend in the name of the licensee any attack upon the right to exercise the license or any phase thereof, and it paid legal retainers throughout the country to thirty or more attorneys for the purpose of defending various attacks upon the system. By the terms of the license agreement, the theater owners agreed to pay a stipulated fee of from $5 to $10 per week for the right to use the system. Affiliated also sold the theater owners all of the accessories and equipment used in the operation of the plan, but more than 80 per cent of its income for the taxable years 1934, 1935 and 1936 was derived directly from the sale of "Bank Night License Agreements."

On December 3, 1936, this court in Affiliated Enterprises, Inc., v. Gantz, 86 F.2d 597, 599, held that the trade-mark

---

income for the taxable year is personal holding income as defined in section 353; * * * and (2) Stock ownership requirement.—At any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals."

"Sec. 353. Personal Holding Company Income. For the purposes of this title the term 'personal holding company income' means the portion of the gross income which consists of: (a) Dividends, interest, royalties (other than mineral, oil, or gas

royalties), annuities." 26 U.S.C.A. Int. Rev.Acts, pages 973, 974.

Personal holding company income is defined by Treasury Regulations 94, promulgated under the Revenue Act of 1936, Art. 353-1, as follows: "The term 'personal holding company income' means the portion of the gross income which consists of the following: * * * (3) Royalties—The term 'royalties' includes amounts received for the privilege of using patents, copyrights, secret processes and formulas, good will, trade-marks, trade-brands, franchises, and other like property. * * *"

registration of the term "Bank Night" afforded Affiliated no protection of the plan or system employed. It further held that Affiliated had no property right in the plan or system called "Bank Night"; that it was "too closely akin [to a lottery]" to "have the protection \* \* \* of a court of equity." On December 18, 1936, the First Circuit in Affiliated Enterprises, Inc., v. Gruber, 86 F.2d 958, likewise held that Affiliated had no property right in the plan or system capable of protection in a court of equity.[2] Thereafter, the Commissioner determined that Affiliated fell within the statutory definition of a personal holding company with respect to its tax liability for the taxable years 1934, 1935 and 1936, and assessed a deficiency accordingly. On redetermination, the Board of Tax Appeals (now the Tax Court) held that since Affiliated had no property right in its idea or system which it could protect, or "on which it could give licenses to others", the income from the sale of the license agreements was not royalty or "other like property", and consequently Affiliated was not a personal holding company within the meaning of the Act. Affiliated Enterprises v. Commissioner, 42 B.T.A. 390. The Board thought that the income was in reality derived from a sales promotion scheme, which those purchasing same believed worth the payment of the fee charged under the written agreement.

On appeal (123 F.2d 665, 667), this court held that the test was not whether the system was patentable or capable of protection in a court of equity, but rather "whether the idea is new or novel and has value." The court stated, "it is apparent from the record that respondent [Affiliated] in its dealings with theater operators treated the transaction as one involving the payment of royalty for the use of a creative, novel idea possessing utility"; that since the parties at the time of the transaction "certainly thought they were dealing with reference to an idea subject to protection by patent or copyright, and that the transaction involved royalty payments", the income derived from the sale of the contracts constituted royalty or other like property for income tax purposes.

■ Whether Affiliated falls within the arbitrary statutory definition of a personal holding company for the taxable year 1937 depends upon the peculiar facts applicable for that year, and not upon its taxable status in any other year. See Mertens Law of Federal Income Taxation, Vol. 7, Sec. 39.01, p. 70. With the beginning of the year 1937, the Gantz and Gruber cases had been given wide publicity by means of trade journals and general newspaper comments. Theater owners and managers were given to understand that Affiliated could no longer claim any exclusive right to the use of the "Bank Night" system, and Affiliated also realized that it had nothing to sell capable of protection as a patentable or copyrightable idea. It was faced with the necessity of changing its "mode of operation" if it were to stay in business. Consequently, to meet this exigency, it devised what it called a "Bank Night Theater Service", which, by means of a manual published early in 1937, it advertised a comprehensive and complete theater service designed to give the independent theater owner specialized advice for the operation of a theater in the most efficient and economical manner. The "Bank Night Theater Service" was advertised through the manual to the theater owners as a "Department of Affiliated Enterprises, Inc., owner of the trade-name, trade-mark, copyrights and/or patents pertaining to Bank Night". Twenty-two items[3] were listed as subjects for specialized advice and counsel. Included in the service offered was the "Bank Night" plan as a "business stimulator", but no exclusive rights in the "Bank Night" idea was claimed, and the accessories and supplies used in connection with the system were furnished without extra cost to the purchasers of the service.

■ Of the total gross income of the taxpayer for the year 1937, 58.32 per cent was realized from the sale of written "License Agreements" identical to those used in prior years, some of which were sold in 1936 prior to the Gantz and Gruber

[2] Affiliated discontinued operations in 1938 when a fraud order was issued against it by the Post Office Department on the grounds that its system constituted a lottery.

[3] Electrical survey, power costs, heating analysis, accounting, advertising and exploitation, architecture, business stimulators, discounts, decorating, electricity, equipment, financing, insurance, laboratories, library, heating and cooling, modernization, physical operation, projection and sound, purchasing advice, valuation, and summary.

decisions, and others in 1937. With respect to this income, Affiliated concedes that it is controlled by the earlier decision of this court, and that it is to be classified as royalty or other like property for the purposes of this case. But 41.30 per cent of the total gross income of Affiliated for the year 1937 was realized from the sale of the "Bank Night Theater Service" to theater operators who did not sign any contract or agreement, but orally agreed to pay a stipulated amount for the service, with the privilege of termination at will. In other words, 41.30 per cent of the taxpayer's income was derived from sources which cannot be said to be attributable to any written agreements wherein the parties by contract "treated the transaction as one involving the payment of royalty for the use of a creative, novel idea possessing utility." The parties did not treat the idea as one subject to protection by patent, copyright, or otherwise. The Commissioner concedes of course that if the 41.30 per cent of the taxpayer's income was realized for services rendered, having no relation to royalties or other like property, it does not come within the statutory definition of a personal holding company for the taxable year 1937.

To hold that the income derived from the oral contracts constituted royalties or other like property is pushing the rule announced in the earlier case beyond the practical and common sense interpretation accorded that term. It follows that Affiliated does not fall within the statutory definition of a personal holding company for the taxable year 1937, and the order of the Tax Court is accordingly reversed.

VAUGHT, District Judge (dissenting).

The main question presented is whether the petitioner, for the year 1937, was a personal holding company within the meaning of Sections 351, 352, and 353 of the Revenue Act of 1936, as amended by the Revenue Act of 1937, 26 U.S.C.A. Int.Rev. Acts, pages 973, 974, and thus subjected to surtaxes as a personal holding company.

The petitioner challenges respondent's determination of a personal holding company surtax deficiency in the amount of $48,132.42 for the year 1937.

There is involved, also, the question as to whether at least 80 per cent. of petitioner's gross income for the year 1937 was holding company income. This is a question of fact, in the first instance, which must be determined from a review of the record. The Tax Court of the United States made its findings of fact, and after a careful consideration of the testimony produced at the hearing, as disclosed by the record, I find no fault with the findings.

In Phillips et al., Executors v. Commissioner of Internal Revenue, 283 U.S. 589, 600, 51 S.Ct. 608, 613, 75 L.Ed. 1289, the court said:

"* * * Save as there may be an exception for issues presenting claims of constitutional right, such administrative findings on issues of fact are accepted by the court as conclusive if the evidence was legally sufficient to sustain them and there was no irregularity in the proceedings. * * *"

As I view the record, there are no issues here presenting claims of constitutional right. I am convinced the evidence was legally sufficient to sustain the findings of fact and there is no irregularity in the proceedings. Therefore, the findings of fact are conclusive and must be accepted here.

The petitioner was before this court in Commissioner of Internal Revenue v. Affiliated Enterprises, Inc., 10 Cir., 123 F.2d 665, involving the income from the contract issued by it in the years 1934, 1935 and 1936. Certiorari was denied, 315 U.S. 812, 62 S.Ct. 796, 86 L.Ed. 1211. This court is bound by that decision, so far as it is applicable here. The same contract issued by the petitioner in those years was used for the year 1937, and the question presented here is set forth in petitioner's brief as follows: "Whether 41.3% of the petitioner's income in the year 1937, which was found by the Tax Court to have been received from oral contracts, constituted royalties within the meaning of Sections 351, 352 and 353 of the Revenue Act of 1936 as amended by the Revenue Act of 1937, and thus subjected the petitioner to surtaxes as a Personal Holding Company."

A pamphlet, "Manual Bank Night Theatre Service for 1937," was introduced in evidence before the Tax Court of the United States. On the final page of this exhibit are the words: "Bank Night Theatre Service, a Department of Affiliated Enterprises, Inc." and in small print immediately below: "Owner of the tradename, trade-mark, copyrights and/or patents pertaining to Bank Night."

The Tax Court of the United States, in its opinion (R. 15), said:

"Furthermore, it is apparent from the record that Respondent in its dealing with theatre operators treated the transaction as one involving the payment of royalty for the use of a creative, novel idea possessing utility. During all the years involved, it had pending applications for a patent and copyright. The trade name was registered in the states in which it operated. The contract was headed: 'Bank Night License Agreement.' It recited that Respondent was the owner of the copyrighted and trade mark name, 'Bank Night,' and of certain copyrights and patents pending. It specifically stated that the intent of the agreement was to grant the licensee the right to use the copyright and trade mark name, 'Bank Night,' and all copyrighted articles. The parties at the time certainly thought they were dealing with reference to an idea subject to protection by patent or copyright, and that the transaction involved royalty payments."

The opinion further stated:

"Neither the Gantz nor Gruber case held that petitioner had no property rights whatever in Bank Night. As to the former, the same court which decided it, later characterized the situation as follows (Commissioner v. Affiliated Enterprises, 10 Cir., 123 F.2d 665, 667): 'The Board seems to have based its decision on the ground that Respondent [petitioner] had no property rights in its idea or system on which it could give licenses to others, because the system was not patentable. * * * But the creative or novel idea would still have value and be subject to contract in the absence of a patent statute. * * * And while we ordinarily think of royalty as payment for patentable or copyrightable articles, it is not necessarily required that the creative idea be subject to patent or copyright.'

"And in the Gruber case, the court said:

" 'At any rate, we think that the name 'Parlay Cash Night' to designate the defendant's business through exhibitions or drawings will have no tendency to confuse the public or plaintiff's [petitioner's] possible customers or licensees * * *.

" '* * * the plaintiff * * * can come into equity for an injunction against unfair competition, prohibiting another from representing the exhibitions promoted by him are exhibitions promoted by it and preventing the unwarranted use of its property to aid him in competing with it. It is not alleged that the defendants have done any of these things. * * *' "

And further:

"The uncontradicted documentary evidence shows that at this time petitioner still maintained its claims to the ownership of copyrights, trade-marks, and similar exclusive proprietorship and some, at least, of these statements were of a nature to have come logically to the attention of prospective customers."

The record also discloses that the petitioner made application for a patent in 1937 and 1938, and that the applications were rejected because "the art cited is unpatentable."

I think the record also justifies the holding by The Tax Court that the petitioner, not only in 1937, but as late as 1938, was clinging desperately to the idea that it had a property right and an interest in the term, "Bank Night," and in everything that might be connected closely with that term.

The facts out of which these "oral contracts" developed are set out in detail in the findings of fact. It appears that evil days had befallen the petitioner in adverse holdings in litigation in various jurisdictions concerning its supposedly protected rights in what it designated "Bank Night." The petitioner was confused and uncertain as to its position. It added other features to its service, and in 1937, it contacted the same motion picture exhibitors, inducing them, where possible, to enter into the same contract issued by it in previous years. In this business, from which its income was derived, it was able to procure written contracts from 58.32 per cent. of such exhibitors. But 41.3 per cent. refused to sign a written contract, and with those, the petitioner negotiated orally. The reason for the exhibitors refusing to sign a written contract is obvious. The publicity of the misfortunes of the petitioner in the courts was such that those exhibitors were doubtful whether they would be able to continue the benefits they were presumed to get under the written contract for the term of the contract, because of the unsettled condition confronting the petitioner. That condition, however, would have very little bearing upon the character of income that was thus sought and produced. There can be no question as to the character of the income produced from the written con-

tracts which constituted the 58.32 per cent. under the decision in Commissioner v. Affiliated Enterprises, Inc., supra. The mere fact that the 41.3 per cent. was income for the identical service under oral contracts would be immaterial as the income would be of the same character.

It is apparent from the record that petitioner was deriving an income from what it at least hoped would eventually turn out to be a protected right. This is evident from the testimony of Charles U. Yaeger, president of Affiliated Enterprises, Inc., when he was interrogated about the oral contracts as follows: (R. 38)

"Q. Well, why was it necessary to say anything about legal advice? A. Because the theaters who operated Bank Nite needed legal advice. If it hadn't been for our legal department they wouldn't have been able to continue operation.

"Q. Well, even with the legal advice they weren't able to continue with Bank Nite, were they? A. Yes, sir.

"Q. Under the contracts with you? A. They were unable to continue after without the contracts and with contracts.

"Q. However, when the fraud order was issued in 1938—A. At that time we discontinued Affiliated Enterprises.

"Q. Yes. Now, what did that legal advice consist of? A. Consisted in defending them against all lottery charges and any other incidental things that might come up pertaining to the operation of the system known as Bank Night.

"Q. Were there any such charges made against people using Bank Nite? A. You mean lottery charges?

"Q. Yes. A. Yes, sir.

"Q. Whereabouts? A. Well, the places were so numerous that I just offhand couldn't state them.

"Q. Well, you could name one, couldn't you?

"Mr. Gould: You mean in the year 1937?

"A. Well, all I know is this, that we were ruled out of several states, ruled out of Illinois, Nebraska, Kansas.

"Q. Yes, but did you ever hear of a theater owner being hailed into court on account of the fact that he operated under the system that we term Bank Nite? A. I myself was. I am a theater operator and my own theater got into court; yes, sir."

In Helvering, Commissioner of Internal Revenue v. Elkhorn Coal Company, 4 Cir., 95 F.2d 732, 735, it was said:

"* * * No rule is better settled than that in tax matters we must look to substance and not to form; * * *."

In Prairie Oil & Gas Company v. Motter, Collector of Internal Revenue, 10 Cir., 66 F.2d 309, 311, this court said:

"* * * If a taxpayer sought to avoid a tax on the profits of such a sale as this by asking the Commissioner to ignore the actualities, he would shortly and properly be reminded that taxation is an intensely practical matter and that the substance of the thing done, and not the form it took, must govern."

When this principle and the entire record in this cause are duly considered, I am of the opinion that the decision of The Tax Court of the United States should be affirmed.