(December 30, 1986)

■ INTERACTIVE PROPERTIES, INC., Respondent-Appellant, v DOYLE DANE BERNBACH, INC., Appellant-Respondent.—Judgment, Supreme Court, New York County (Wilk, J.), entered February 27, 1986, which, after a nonjury trial, awarded plaintiff damages of $538,344 plus interest from July 7, 1975, costs and disbursements, for a total sum of $979,020.23, modified, on the law and the facts and in the exercise of discretion, to award plaintiff damages of $325,000 discounted to present value as of July 7, 1975, plus interest from that date, costs, and disbursements, and, as so modified, otherwise affirmed, without costs. Settle order.

The plaintiff, a licensed real estate broker, had a written contract for a period of nine months with defendant, a major advertising agency, to negotiate, on an exclusive basis, for new office space in midtown Manhattan. The plaintiff commenced this action, alleging that defendant prevented performance of the agreement by using another broker to lease office space in the building located at 437 Madison Avenue. The plaintiff sought as damages the commission earned on the lease. At the close of plaintiff's case in the first trial of this action, the trial court granted defendant's motion to dismiss the complaint, without prejudice to a claim in quantum meruit or claims against third parties. We reversed and remanded the matter for a new trial, holding that plaintiff had presented enough evidence to make out a prima facie case and raise factual issues as to whether it had sustained damages as a consequence of the violation of the agreement and, if so, in what amount. (*Interactive Props. Corp. v Doyle Dane Bernbach*, 66 AD2d 667 [1st Dept 1978].)

In April 1985 a second trial was held. The proof at the second trial was substantially similar to that adduced by the plaintiff at the first trial. The defendant claimed that the agreement was not exclusive in nature and was conditioned on its freedom to pursue deals in progress without any obligation to turn away brokers that would not share commissions with plaintiff. The facts as found by the trial court, and the uncontroverted evidence bearing upon the measure of damages, may be summarized as follows:

In 1974 defendant occupied commercial space at 20 West 43rd Street under a lease due to expire on October 31, 1975. It desired to relocate, and authorized plaintiff to act as its exclusive broker for this purpose. However, in September 1974, it revoked the exclusivity feature of the arrangement. The plaintiff continued to act as broker for defendant, and in October 1974 its principal, Joseph Lambert, prepared a survey of available office space in midtown Manhattan. The survey listed "several floors" and "the possibility of a block from ITT" (International Telephone & Telegraph) at 437 Madison Avenue. It appears that it was generally known in the market that ITT had vacant space at this location. Subsequently, Peter Friedman of City Center Real Estate (City Center) proposed, and was authorized to negotiate on defendant's behalf for, an assemblage of space to be created by subletting contiguous floors from ITT and other tenants at 437 Madison Avenue. Friedman insisted, and Joseph Daly and Neil Austrian, defendant's chairman and chief financial officer, respec-

tively, agreed that the proposed negotiations with ITT would be kept confidential, particularly from Robert Kaufman, the co-owner of the premises, Lambert, and J. Ross MacLennan, an officer of defendant, whom Friedman perceived as being close to Lambert.

At a meeting on January 9, 1975, between Lambert, Austrian, and MacLennan, Austrian agreed to restore plaintiff's status as exclusive broker for a period of nine months. He further agreed that the exclusive agreement would include any properties negotiated thereafter, whether originating with Lambert or another broker. He did not disclose the negotiations for 437 Madison Avenue, but turned over the negotiations for the Uniroyal and Celanese buildings. The following conversation transpired:

"Austrian: Now that you're the exclusive broker, I'll turn those negotiations over to you. Just work something with those brokers.

"Lambert: Fine."

By letter dated the following day, MacLennan confirmed the agreement, as follows: "This will confirm that you are authorized exclusively to negotiate on our behalf for office space for a period of nine months from this date."

By early 1975 Kaufman learned that defendant was negotiating with ITT for a sublease. The ITT lease precluded a sublease without his consent. Sometime after February 1975 Kaufman notified Friedman that negotiations would have to be conducted directly with him.

During a meeting with Austrian on March 4, 1975, Lambert proposed negotiating for the space occupied by ITT at 437 Madison Avenue. Austrian instructed Lambert not to pursue that proposal since City Center had been authorized to handle the negotiations with ITT. Lambert protested, and repeatedly asserted to MacLennan and Austrian that he was entitled to negotiate the 437 Madison Avenue Lease as defendant's exclusive broker, and to receive a full commission. On or about July 1, 1975, defendant signed a lease for the Madison Avenue space. City Center was named as the broker and the owner paid it a commission of $650,000 on an installment basis over a period of several years.

It is fundamental that the damages awarded for breach of contract must, as nearly as possible, restore to the injured party all that he has lost by the breach and all that he, in reasonable probability, would have gained had there been no breach. *(Norman v Vandenberg,* 157 Mo App 488, 138 SW 47

[Kansas City Ct App, 1911].) The precise issue of the proper measure of damages for breach of an exclusive agency to negotiate for the leasing of property has not been previously addressed by the courts of this State.

New York is in the minority of jurisdictions where damages for breach of an exclusive agency agreement to sell certain property, based upon the principal's employment of another agent, are measured "not necessarily" by the amount of commissions, but rather by the expenses actually incurred and the profits or commissions lost on a sale the exclusive broker would have made. (Slattery v Cothran, 210 App Div 580, 583-584 [4th Dept 1924]; Ann., 64 ALR 395, 404; see, 5 Corbin, Contracts § 1025 [1964].) Applying this principle to the present case and predicting what would have happened, given the nature of the contract and the peculiar fact pattern, presents a difficult question.

We conclude that plaintiff failed to prove that it would have earned the entire commission by independently procuring the Madison Avenue lease, or any commission by procuring another lease acceptable to defendant. Contrary to plaintiff's contention, defendant did not lease the very space plaintiff had proposed subleasing from ITT in October 1974 and again on March 4, 1975. The lease which defendant signed included, in addition to the space occupied by ITT, an option to lease the floor occupied by Carl Ally, Inc., when its lease expired in November 1977. Subletting this assemblage of space was the brainchild of City Center.

Furthermore, the commissions to be earned on other leases proposed by plaintiff are only a matter of conjecture. Although plaintiff adduced substantial credible evidence that its efforts resulted in at least one, and perhaps as many as three lessors who were ready and willing to meet defendant's general terms, effecting another lease is too dependent upon taste or fancy to be considered anything other than speculative and uncertain. The defendant could have found plaintiff's proposals unacceptable, and remained in the space it then occupied. The plaintiff did not prove that the breach was either willful or motivated by avarice so as to warrant resolving doubts as to the measure of damages against defendant. (5 Corbin, Contracts § 1020.) The defendant did not breach the agreement to avoid payment of the commission, since it was payable by the landlord. The breach resulted directly from the secret pact with City Center. The defendant seriously considered the various proposals submitted by plaintiff, and asked

Friedman, in April 1975, about his willingness to share the commission with plaintiff.

However, we agree with the trial court's conclusion that the instant agreement contemplated the referral of proposals for office space submitted by other brokers, and made no exception for the Madison Avenue space. In our view, plaintiff proved, to a reasonable degree of certainty, that defendant's breach prevented it from earning one half of the commission paid to City Center for negotiating the subject lease.

The defendant claims that the Madison Avenue lease was entirely unavailable to plaintiff because City Center controlled the transaction and absolutely refused either to divulge its plans or to work with plaintiff. It seeks to support this claim with testimony by Austrian that he told Lambert that Friedman had absolutely refused to work with him, and preferred to offer the deal to another interested tenant. The trial court evidently did not, nor do we, credit this indirect and self-serving testimony as to the value of the opportunity lost by plaintiff, particularly in view of the lack of corroborative testimony by Friedman. Friedman testified that, in April 1975, Austrian indicated that he had a letter that could cause a problem in the deal. Austrian asked if he would accept half a commission, and Friedman refused. Friedman's testimony does not substantiate defendant's suggestion that, had plaintiff insisted, he would have been unwilling to work with Lambert in January 1975.

The defendant did establish that the need for secrecy was a genuine, vital element of the negotiating strategy devised by Friedman. Friedman testified that confidentiality was paramount and that keeping the negotiations secret from MacLennan, Lambert, and Kaufman was part of his general scheme to take advantage of Kaufman's substantial ability to create additional space. He planned to ascertain ITT's position before Kaufman learned of defendant's interest, in which event City Center's leverage to cure defendant's long-term space problems would consequently be diminished. Yet, neither the business utility of the secret arrangement nor a prospective lawsuit by City Center for at least half of the commission rendered the deal "off-limits" to plaintiff so as to justify the breach. Consonant with its implied obligation not to impede or frustrate performance by plaintiff, defendant cannot rely upon its wrongful conduct, which prevented plaintiff from negotiating the Madison Avenue lease, to prove that plaintiff sustained no injury. *(See, Patterson v Meyerhofer,* 204 NY 96 [1912].)

The record reflects that Kaufman, not City Center, controlled the transaction and would have dealt with plaintiff as the authorized broker. That City Center conceived of assembling the space did not empower it either to dictate the terms of the deal or to select the lessee. Indeed, Kaufman took the opportunity to restructure the transaction into an outright lease. The defendant adduced no proof that once plaintiff commenced negotiations on its behalf, Kaufman would have made the Madison Avenue space available to some other tenant which City Center suggested in preference to defendant. If defendant had insisted that plaintiff be permitted to negotiate on its behalf, particularly once Kaufman became a party to the negotiations, City Center would probably have acceded to the request rather than risk losing its share of the commission altogether. Kaufman testified not that he would only deal with the first broker to put a deal together and approach him on behalf of a particular client, but that in any situation he would not be involved with two brokers at the same time. As the trial court found, it was not until March 1975, when negotiations through City Center had reached an advanced stage, that he would have refused to negotiate with plaintiff.

We partially agree with the trial court's alternative suggestion, and conclude that assuming arguendo the ITT negotiations had been properly excepted from the exclusive agency agreement, plaintiff nonetheless would have been deprived of the opportunity to negotiate the lease with Kaufman. However, in this instance as well, plaintiff would only have shared the commission with City Center.

The trial court erred in overlooking testimony by Lambert that, had he been permitted to negotiate the lease which City Center proposed and procured in accordance with the exclusive agency agreement, he would have split the commission with City Center. As to commission sharing in those circumstances, Lambert testified:

"THE COURT: Let me ask you a different question, because you spoke of a possibility of working out some arrangement with Cushman & Wakefield.

"If the Uniroyal property was what was negotiated, is there a standard in the marketplace about how that would be worked out as between yourself and Cushman & Wakefield?

"THE WITNESS: *I wouldn't say it's a standard which applies 95 percent of the time, but I would say that more than 50 percent of the time in such a circumstance the brokers would evenly split the commission.*

"THE COURT: What happens if you are the exclusive broker, somebody else comes up to Doyle Dane and says, 'I understand you have this exclusive broker but I've got this super property that I think you'll be interested in,' then Doyle Dane says that they should speak to you and you work out an arrangement with the new broker about what to do with the commission?

"THE WITNESS: Only under certain circumstances. What happens is, Doyle Dane refers that broker to me, that is the first part, which they did do on many, many occasions, and then the broker—and this is again—I'm just telling you what happens in the marketplace, the broker would say to me, let's assume it's the broker that knows me by reputation or knows me actually, which most do, 'Joe, I have such and such a property.' Now, if in most cases as a practical matter—I mean, if it's a property I know, if it's a property I've offered Doyle Dane, if it's a property I'm on the verge of offering Doyle Dane, it's a property where it's going to come on the market or be known to most brokers within the next few weeks, if it's a property like—which is, I will tell you, your Honor, that is 97 percent of all properties fall into that category, then there is no obligation on the exclusive broker's part, that's the point of being an exclusive broker, to just because someone is coming at a particular point in time and offering one of many, many buildings, there is no obligation to share and, in general, exclusive brokers do not. Okay?

"However, let's take another situation. *In order to do the job in good faith for the tenant, suppose there is a property which would not be known for the next—I'll take the extreme, six months, okay, if not for this particular type of information coming forward then an exception might be made by the exclusive broker in good faith doing what's right for his principal.* At the point at which the tenant has given the exclusive broker the exclusive right, it is up to the exclusive broker. That's what an exclusive is all about.

"We're giving the exclusive broker the agreement, we're giving it to him, he's going to do all the dealing and negotiating for us, we are placing our faith in him.

"And in almost all cases the exclusive broker receives the full commission. *There may be extraordinary circumstances or pretty special circumstances under which he would find that to benefit his principal something unusual would happen.*" (Emphasis added.)

In our view, this was just such an extraordinary or special case of an unavailable property discovered by another broker,

where plaintiff, despite its status as exclusive broker, would have been required to work with City Center and to share the commission in order to satisfy its fiduciary obligation to defendant. *(See, Hammond v C.I.T. Fin. Corp.,* 203 F2d 705, 708 [2d Cir 1953].)*

Assuming arguendo that these were not extraordinary and special circumstances, the evidence supports the conclusion that the parties understood the agreement as providing for cobrokerage where another broker procured the lease accepted by defendant. Lambert admittedly contemplated working out arrangements on any commissions earned in connection with the Uniroyal and Celanese properties turned over to him at the January 9th meeting. The plaintiff's characterization of Lambert's comment: "Fine", as only an accommodation to the defendant, limited to the Uniroyal and Celanese properties, is unconvincing. The plaintiff's abstract right or discretion as an exclusive broker to decline to work with other brokers is irrelevant. It either agreed, or was required, to cooperate in the circumstances. The commission-sharing theory of damages was not waived, although it was not advanced by defendant at trial, since it was explored by the trial court *sua sponte.*

Again assuming arguendo that the aforestated principles are not dispositive, we believe that plaintiff is equitably entitled to damages measured by half of the commission paid by the owner, based upon its performance in connection with the exclusive agency agreement. Plaintiff demonstrated that it expended substantial time and energy in proposing numerous properties and negotiating extensively on defendant's behalf in relation to certain properties. We are persuaded that defendant's breach prevented plaintiff from conducting the negotiations for the Madison Avenue lease, and that the evidence warrants the award of half of the commission as a reasonable estimate of the lost commission. The usual methods for assessing compensatory damages are only " 'guides in the estimation of damages,' the application of which 'requires the use of more judicial discretion than is usually the case.' " (Restatement of Contracts § 329, comment a, cited in 5 Corbin, Contracts § 992, at 6.) "[T]he party who has caused the loss may not insist on theoretical perfection." *(Entis v Atlantic Wire & Cable Corp.,* 335 F2d 759, 763 [2d Cir 1964].)

We reject plaintiff's claim that it is absolutely entitled, as a matter of law, to the entire commission. The plaintiff seeks to support its claim to the entire commission by likening the instant agreement to the "exclusive right to sell" variety of brokerage agreements. It is well accepted that a principal who

makes a direct sale of property in violation of an exclusive right to sell certain property is liable to the broker for the agreed-upon commission, regardless of whether he would have effected the sale. *(See, e.g., Hammond, Kennedy & Co. v Servinational, Inc.,* 48 AD2d 394 [1st Dept 1975]; *Gaillard Realty Co. v Rogers Wire Works,* 215 App Div 326 [1st Dept 1926]; *Mosberg v Goldberg,* 117 NYS2d 568 [Sup Ct, NY County 1952]; *Bagley v Butler,* 59 Misc 2d 1029 [County Ct, Rensselaer County 1969]; *Hammond v C.I.T. Fin. Corp., supra.)* Those cases, however, are not here dispositive, since each involved a specified commission and none involved the principal's use of another broker. In contrast, there was no specified commission here, and plaintiff had an exclusive agency, which prevented defendant from employing another broker, but did not preclude defendant from itself making a deal without becoming liable to plaintiff for a commission. *(Slattery v Cothran, supra,* at p 583; *Hammond, Kennedy & Co. v Servinational, Inc., supra,* at p 397.) *Bagley v Butler (supra)* is distinguishable because it involved an agreement which expressly provided for payment of the commission if another person effected the sale. We believe that plaintiff was required to prove that it would have independently procured the lease signed by defendant in order to receive the entire commission as the measure of damages. A careful reading of *Hammond v C.I.T. Fin. Corp. (supra)* indicates the infirmity of plaintiff's claim to the entire commission. The court there held that the principal who, in breach of an exclusive right to sell, dealt directly with a buyer rather than referring the buyer to the broker was liable for the full commission because the broker demonstrated that he would have been as successful as the principal in negotiating with the purchaser. *(Supra,* at p 708.) Here, as discussed *supra,* the evidence demonstrated that plaintiff, acting independently, would not have been as successful as City Center in procuring the Madison Avenue lease, but would have successfully conducted the negotiations and earned half of the commission.

Parenthetically, we note that defendant can pursue its severed third-party action against City Center to recover half of the commission based upon an alleged 1973 fee-splitting agreement between Lambert and his former employer, City Center. The trial court properly excluded proof with respect to this agreement as irrelevant and collateral to plaintiff's cause of action. We have considered the remaining contentions of the parties, and find that they are lacking in merit. Concur—Murphy, P. J., Kupferman, Milonas, Rosenberger and Ellerin, JJ.