*724 OPINION OF THE COURT
Orlando Marrazzo, Jr., J.
A trial was held before the court on June 17, 2011, and June 23, 2011, and based on the evidence and testimony of the witnesses the court makes the following findings of fact and conclusions of law.
This action to recover damages for breach of contract originated in the Supreme Court, Richmond County, where Judicial Hearing Officer Michael Ajello, in a decision dated November 2, 2009, determined that a breach of contract had occurred in fact. Along with this finding, an award for damages against the defendant, M.S.B. Development Company, Inc. (hereinafter the defendant), was entered and the defendant’s counterclaim against the plaintiff, Casandra Properties, Inc. (hereinafter the plaintiff), was dismissed. During the trial before Judicial Hearing Officer Ajello, the action against defendant Savo Brothers was discontinued, leaving only M.S.B. Development Company, Inc., as a defendant. On appeal from that non-jury decision, the Appellate Division, Second Department, in its December 28, 2010 decision, modified Judicial Hearing Officer Ajello’s decision (Casandra Props., Inc. v M.S.B. Dev. Co., Inc., 79 AD3d 1088 [2010]).
The Appellate Division affirmed the finding of liability for breach of contract and the dismissal of the defendant’s counterclaim, but also determined that the method of calculating damages was in error, and thus deleted the damages award from the decision. The Appellate Division then remanded the case back to the Supreme Court for a retrial on the issue of damages, though without setting forth how damages are to be calculated. Pursuant to the authority granted to the Supreme Court by CPLR 325 (d), the Supreme Court transferred the claim to the court it is now before, the Richmond County Civil Court.
As was found by both the Supreme Court and the Appellate Division, the parties to this action entered into a contract dated June 11, 1997 which provided that plaintiff would act as defendant’s exclusive broker for the sale of the houses in a 90-unit development called “Sailor’s Key.” This agreement bestowed a commission of $4,500 per house upon the plaintiff, with the “commission to be deemed earned, and due and payable at time of actual closing of title to any such house.” By its terms the contract could be cancelled only if (1) “Casandra Zappala, *725 individually, no longer devotes her time and energy on behalf of Casandra Properties, Inc. to this project,” or (2) plaintiff “fails to have purchasers enter sales contracts to sell a minimum of 40 semi-attached or 25 detached homes per year.” The sales period for the houses in the “Sailor’s Key” development began in March of 2006 with an open house event at the development. After roughly 4V2 months of slow sales, the defendant sent a letter to the plaintiff in August of 2006 terminating their agreement, claiming that Ms. Casandra Zappala from Casandra Properties was no longer dedicating enough of her time to the sale of the houses in the project. Upon the termination of their contract by defendant, the plaintiff brought suit in the Supreme Court to recover damages of $405,000, the contractual price of the commission multiplied by the 90 houses that they would have had the opportunity to sell at “Sailor’s Key” had their contract not been terminated.
The preceding courts have determined that neither of the above two conditions were in evidence at the time of the contract’s termination, thus establishing liability for a breach of contract against the defendant when it violated the terms of the agreement and hired a new real estate broker to market the project. Upon this finding of liability, the Supreme Court of Richmond County awarded damages of $112,500 to the plaintiff. This amount was arrived upon by the court by multiplying the commission agreed upon in the contract by the number of houses sold within the first year of sales in “Sailor’s Key” — this number was 25, sold by the successor broker. It was this damages calculation that the Appellate Division, Second Department, took issue with.
After upholding the Supreme Court’s finding of liability and dismissal of the counterclaim, the Appellate Division determined that the defendant’s appeal in terms of the damages calculation had merit. According to the interpretation of the Appellate Division, the contract did not provide for “an exclusive right to sell the 90 units, whereby it would be entitled to a commission for any sales within the period of the agreement, no matter who procured the buyer.” (79 AD3d at 1090.) Instead, the Appellate Division found, the contract merely provided for an exclusive agency agreement, and the damages for breach of an exclusive agency agreement “are measured not necessarily by the amount of commissions, but rather by the expenses actually incurred and the profits or commissions lost on a sale the exclusive broker would have made.” {Id. [internal quotations marks omit *726 ted].) Thus, the Appellate Division tells us, the calculation of damages requires this court to “determine the number of units that would have been sold had the agreement not been improperly terminated, multiply that number by $4,500, and then subtract the necessary expenses the plaintiff would have incurred had it remained the defendant’s broker.” (Id. at 1090-1091.)
With this new damages calculation handed down to this court by the Appellate Division, this action for damages has become a case of apparent first impression. As such, this court must interpret the mandate from the Appellate Division without any preceding decisions to use as a guide.
Plaintiffs counsel contends, and attempted to demonstrate through trial, that this new damages calculation entitled plaintiff to recover $126,000 from defendant for the breach of contract; this results from a multiplication of $4,500 for a commission on each of the 28 houses sold in the first year of the contractual period. Citing to Plant Planners v Pollack (60 NY2d 779 [1983]), and R & I Elec, v Neuman (66 AD2d 836 [1978]), plaintiff argues for a standard of proof for lost prospective profits that allows recovery if the plaintiff has supplied merely “some adequate basis for computing the amount” when an amount cannot be easily determined. Thus, the plaintiffs argument would have us assume that the plaintiff was no less skilled than the broker that became its successor. Instead, the increase in sales after the plaintiffs wrongful termination was due to the changed circumstances out of the plaintiffs hands, such as the defendant’s lowering of the price and offering of incentive packages or the lender’s more preferable mortgage rates. Had it been given the same environment to do sales, the plaintiff contends, it would have easily matched its successors’ success, if not outpaced it.
Defendant argues, quite to the contrary, that damages cannot be determined by so relaxed a standard of proof. Citing to Berley Indus. v City of New York (45 NY2d 683 [1978]) and Najjar Indus. v City of New York (87 AD3d 329 [1982]), defendant argues that the calculation of damages owed to plaintiff cannot be based upon the sales procured or concluded by the successor broker, or upon the actual experience of the successor broker. The defense asserts that the calculation of damages must be reasonably certain and not speculative or conjectural. Accordingly, defendant contends that damages must be based upon the plaintiff’s history of sales prior to defendant’s breach of *727 contract, less overhead expenses the plaintiff would have incurred in marketing the houses.
Prior to the breach, prospective buyers had signed two contracts and one real estate binder during the period of March 2006 to August 2006, all of which concluded in the sale of three total properties. Defendant argues that there is no other way of computing damages besides projecting this number over the remaining term of the original contract, for a total of six sales. Defendant’s claim that the expenses incurred by plaintiff for the remaining seven months of the contract would be at least the amount plaintiff expended within the first five months of the contract. Defendant concludes that damages due to plaintiff should be the amount of projected sales (six) multiplied by the commission amount for each unit ($4,500), totaling $27,000, and should be offset by the amount spent on overhead during the first five months of the project.
Key to the calculation of damages in the case at bar is the experience of the case Interactive Props. v Doyle Dane Bernbach (125 AD2d 265 [1986]), which is cited to by the Appellate Division’s decision in this matter. In this case, the Appellate Division, First Department, found that the plaintiff failed to prove that it would have earned the entire commission for the procurement of a new premises for the defendant. (125 AD2d at 268.) This is because, as the Appellate Division, Second Department, informed us in its decision on the appeal of this case, “[damages] are measured not necessarily by the amount of commissions, but rather by the expenses actually incurred and the profits or commissions lost on a sale the exclusive broker would have made.” (79 AD3d at 1090 [internal quotation marks omitted].)
In a case for lost profits due to a breach of contract, there is an amount of speculation as to damages simply by necessity of the situation at hand. Thus, damages awarded for lost profits are “recoverable where plaintiff has supplied some adequate basis for computing the amount, even where that amount cannot be precisely determined.” (Plant Planners v Pollack, 60 NY2d 779, 780-781 [1983].) Plaintiff has requested that this court compute damages by assuming that each of the houses sold in the first year of the contract — March of 2006 to March of 2007 — would have been sold by the plaintiff had it been allowed the opportunity to complete its contract with defendant absent the breach. In fact, plaintiff made a compelling case that it laid substantial groundwork for the sale of homes in the *728 “Sailor’s Key” development, and a compelling case that the benefits that came about towards the end of its tenure and after its tenure were a serious boost to sales in a downward spiraling economy.
This court does not think that the successor broker was possessed of some mystical level of ability that allowed its agents to immediately come on the scene and excel where plaintiff had seemingly failed. Rather, it is apparent that the various open houses and limited advertising campaigns done by plaintiff worked as a catalyst for rising awareness of the development project. Thus, many of the sales in the first contractual year could certainly be attributable to plaintiffs work and thus would present lost commissions on properties plaintiff would have sold. This groundwork, however, cannot be said to override all of the efforts of the successor broker. It is quite apparent that Mr. Tom Kurblesky, the plaintiffs “point man” on the project, had utterly no experience selling property of this type and was far less effective at selling the houses in the project than his successor. Furthermore, the low commission that was offered to plaintiff undoubtedly affected plaintiff’s compulsion to work voraciously for the sales. As such, this court simply cannot agree with plaintiffs position that it is owed commissions on all the houses sold in the first year.
Still, the decreased prices and increased options offered in the basic house in the development community would have doubtlessly aided plaintiff in its sale of homes were it to have been allowed to continue selling beyond the date that its contract was terminated. Consequently, this court finds the defendant’s position of simply attributing to plaintiff only so many more sales as were sold by plaintiff in the time before its wrongful discharge to be overly simplistic. It is this court’s opinion that plaintiff would have been able to sell more than an additional three houses with the climate that the successor broker met in August when it came onto the job. Thus, this court believes that plaintiff is entitled to the lost commissions on 15 homes; 12 contracted by the successor and the three contracted by the direct efforts of the plaintiff. This would result in $67,500 in lost commissions.
From this figure, the Appellate Division, Second Department, has directed this court to subtract any costs incurred by the plaintiff. Plaintiffs business model works in such a way that plaintiffs agents do not receive salaried compensation, thus no expenses come from employee compensation. The only expenses *729 incurred by plaintiff in the pursuit of its fulfillment of this contract that are in the record would be those of advertising costs. Over the course of the first three months of the contractual first year — from March to May of 2006 — plaintiff spent $756.44 on various advertising costs, which it introduced into evidence at the original trial before the Supreme Court. To properly estimate expenses, this court is assuming that the same costs would have been incurred every three months over the course of the first year. As the costs of the first three-month period have already been expended, there only remain three more; the expenses incurred over those nine months then would have been $2,269.32.
Thus, this court finds that the plaintiff is due damages of $65,230.68, plus all costs and interest accrued from the end of March 30, 2007. This number is arrived at by attributing the $4,500 commission to each of the 15 houses that this court finds plaintiff would have sold in the first year, and subtracting the expenses that the plaintiff would likely have incurred had it remained on the job. Thus this court awards plaintiff a judgment for damages against defendant M.S.B. Development Company, Inc., in the amount of $65,230.68, together with statutory interest plus costs and disbursements.